Jose BATTLE

v.

John J. NORTON, Warden, Federal Correctional Institution, Danbury, Connecticut, et al.

Civ. No. B-853.

United States District Court,
D. Connecticut.

Oct. 23, 1973.

Dennis Curtis, New Haven, Conn., for petitioner.

Peter Mear, Asst. U. S. Atty., New Haven, Conn., for respondents.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

This case raises interesting and potentially troublesome issues concerning the decision-making process of the United States Board of Parole. Petitioner was sentenced on March 30, 1973, to serve eighteen months for the offense of failure to appear. 18 U.S.C. § 3150. Sentence was imposed pursuant to 18 U.S.C. § 4208(a)(2), which makes a prisoner eligible for parole "at such time as the board of parole may determine," rather than after serving one-third of the sentence, as required by 18 U.S.C. § 4202.

While incarcerated at the Federal Correctional Institution at Danbury, petitioner was considered for parole pursuant to the Experimental Parole Board Regionalization Project (hereafter "pilot project") adopted by the Board on Octo-ber 19, 1972. Bureau of Prisons Operations Memorandum (B.P.O.M.) 40100.14. This pilot project was put into effect for an expected one-year period at five institutions in the Northeast, including the Federal Correctional Institution, Danbury. It introduced several innovative and generally constructive changes to parole procedures, including a requirement that the reasons for a parole decision be communicated to the inmate. *Ibid.* ¶ 6. On July 27, 1973, petitioner was denied parole and continued to expiration. Under the caption "reasons" (plural original), he was told: "Your release at this time would depreciate the seriousness of the offense committed." According to petitioner's sentence computation record, his mandatory release date, after credit for pre-trial detention time and good time, is November 24, 1973, although petitioner alleges, and the Government's response apparently agrees, that his mandatory release date is October 26, 1973.

On August 14, 1973, petitioner filed this action against the warden at Danbury and the Board seeking a writ of habeas corpus or mandamus to secure his release and to require the Board to follow its statutory obligations. His essential complaint is that specification of the reason given for denial of parole demonstrates that the decision to deny parole was arbitrary and beyond the discretion committed to the Board by 18 U.S.C. § 4203.

The petition was originally dismissed on August 27, 1973, for failure to exhaust the administrative appeals procedure of the pilot project. See Lupo v. Attorney General, Civil No. B-820 (D. Conn. July 17, 1973). Unlike most review procedures, which specify maximum time periods for taking appeals, the review procedure of the pilot project specifies minimum time periods prior to which appeals may *not* be taken. Review of the initial decision made by two hearing examiners may not be sought from the Regional Board Member until thirty days after the examiners' decision, and the Regional Member's deci-

sion may not be appealed to a three-member panel of the Board until ninety days after its receipt. B.P.O.M. 40100.-14, ¶ 6. These waiting periods, which must precede review and appeal, are surely not among the commendable features of the pilot project, and have been replaced effective October 1, 1973;[1] nevertheless in this District their observance has, as a general rule, been required. Though petitioner originally claimed his mandatory release date would arrive before he could pursue his administrative appeals, he was nevertheless required to exhaust because there had been no indication that the Board would apply these inexplicable waiting periods to him.

Petitioner then pursued the first level of review to the Regional Board Member. After receiving no response, he telephoned the Board and could receive no assurance that his request for review and appeal would be considered prior to his mandatory release date. In these circumstances administrative remedies were not realistically available. This Court therefore granted petitioner's motion for reconsideration on September 19, 1973, directed respondents to respond to the petition, and appointed counsel for petitioner. A hearing was held on September 28, 1973, at which oral argument but not evidence was presented. Respondents subsequently filed an affidavit of Maurice H. Sigler, Chairman of the Parole Board (set out in full as appx. 1, *infra*), and a report on the Board's decision-making policies and practices prepared by the Research Center of the National Council on Crime and Delinquency. Hoffman and Gottfredson, Paroling Policy Guidelines: A Matter of Equity, June, 1973 (hereafter "NCCD Report").

 Jurisdiction, which neither side has considered, is not entirely clear.

Petitioner is essentially suing the Board to require it to conform its decision-making process to what he claims to be its statutory requirements. There is authority that such suits must be brought in the District of Columbia, the situs of the Board. Howell v. Hiatt, 199 F.2d 584, 585 (5th Cir. 1952); Langston v. Ciccone, 313 F.Supp. 56, 60 (W.D.Mo. 1970); Head v. Kearney, 142 F.Supp. 569, 570 (E.D.Tex.1956). However, petitioner has also sued the warden, and one claim of relief seeks immediate release. That claim properly invokes the habeas corpus jurisdiction of this Court. 28 U.S.C. § 2241. Technically, a decision that petitioner is not entitled to release but entitled at most to a new parole hearing might be thought to exhaust this Court's habeas corpus jurisdiction and require petitioner's complaint about Board procedures to be filed in the District of Columbia. However, since such a course would in all likelihood only result in a transfer of the suit back to this district, see Scarpa v. U. S. Board of Parole, 477 F.2d 278, 280 n.5 (5th Cir. 1973), it seems preferable to exercise habeas corpus jurisdiction generously and consider the merits of petitioner's complaint about the Board's procedures. Even if a favorable parole decision can in no event be judicially required, Tarlton v. Clark, 441 F.2d 384 (5th Cir. 1971), a proposition accepted even by the dissenting opinion in *Scarpa, supra,* 477 F.2d at 286, it does not follow that a warden could not be ordered to release a prisoner held after parole had been denied in an unlawful manner. Presumably the Board would be given time to correct its error, if such were found, not unlike a state court's being permitted to retry a state prisoner unconstitutionally convicted. But the potential remedy of release directed against the warden in the event a

---

1. On September 24, 1973, the Board formalized the pilot project with detailed regulations published in the Federal Register, Vol. 38, No. 184, 28 C.F.R. § 2.1 et seq. (revised). These regulations make a revised pilot project applicable to the Board's Northeast Region, effective October 1, 1973.

Under the revised pilot project, appeal from the hearing examiners' decision must be taken to the Regional Director *within* thirty days, and appeal from the Regional Director's decision must be taken to the National Appellate Board *within* thirty days. 28 C. F.R. §§ 2.20, 2.21 (revised).

procedurally unlawful denial of parole were not corrected is sufficient to justify § 2241 jurisdiction here. While earlier concepts of the scope of habeas corpus relief would not have permitted the writ to lie against a prison official where a parole decision was under challenge. Goldsmith v. Aderholt, 44 F.2d 166 (5th Cir.), cert. denied, 282 U.S. 901, 51 S.Ct. 215, 75 L.Ed. 794 (1930), jurisdiction under § 2241 in this case seems justified by more recent decisions. United States ex rel. Marrero v. Warden, Lewisburg Penitentiary, 483 F.2d 656, 659 (3d Cir. 1973) (habeas corpus jurisdiction upheld to review Parole Board's decision as to parole eligibility).

The issue on the merits is whether the Board has exceeded its statutory authority when it denies parole for the expressed reason that release would "depreciate the seriousness of the offense." [2] The pertinent statute provides:

> If it appears to the Board of Parole from a report by the proper institutional officers or upon application by a prisoner eligible for release on parole, that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the welfare of society, the Board may in its discretion authorize the release of such prisoner on parole. . . . 18 U.S.C. § 4203(a).

As a matter of parsing, it could be argued that the two criteria specified—the prisoner not committing crimes and his release being compatible with society's welfare—are not exclusive, since, even if it appears to the Board that these two criteria are met, the Board still has "discretion" whether to grant parole. However, the second criterion is so broad that there seems little point in infusing the word "discretion" with meaning beyond what can fairly be comprehended in the two specified criteria. See Scarpa v. U. S. Board of Parole, supra, 477 F.2d at 281; Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225 (1963).

Petitioner contends that seriousness of the offense is not within the Board's proper consideration of either criterion whether or not assessed along with other factors. The Government contends that this factor can properly be relied on without regard to other factors in determining that the prisoner's release is not compatible with the welfare of society.

■ A court considering these contentions must acknowledge the broad discretion normally accorded the Board in granting or denying parole, Scarpa v. U. S. Board of Parole, supra; Hyser v. Reed, supra. While a parole agency's decision is not always immunized from judicial review, see, e. g., Palermo v. Rockefeller, 323 F.Supp. 478 (S.D.N.Y. 1971); Sobell v. Reed, 327 F.Supp. 1294 (S.D.N.Y.1971), specification of reasons for denying parole is not constitutionally required, Menechino v. Oswald, 430 F.2d 403 (2d Cir. 1970); Elting v. Norton, Civil No. B-685 (D.Conn. June 4, 1973). A discretionary decision cannot stand when it is shown to be based on a reason that is outside the scope of statutory authority. Cf. Kent v. Dulles, 357 U.S. 116, 128, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). Yet unless the impropriety of the reason were plain, this Court would be hesitant to invalidate a reason and risk inhibiting the Board from further

2. This phrase, as a reason for parole denial, is derived from the Model Penal Code, § 305.9(1)(b), proposed final draft no. 1, Apr. 24, 1961. Petitioner correctly points out that the framework of the Model Code is not identical to the sentencing and parole provisions of Title 18. The Model Penal Code contemplates indeterminate sentences from judicially determined minimums up to statutory maximums, see Model Penal Code, § 6.06. With sentences thus imposed, the parole decision becomes more explicitly a part of the determination of the appropriate length of sentence than occurs when sentencing judges select individualized maximums within statutory limits. Of course, the fact that seriousness of the offense was specified as a reason for denying parole in the different context of the Model Penal Code does not mean that it is an impermissible factor under 18 U.S.C. § 4203.

progress along the commendable course of explicitly bringing rationality to the exercise of its discretion. Courts, which have historically given few if any reasons for their determination of the length of sentences, but see United States v. Velazquez, 482 F.2d 139, 142 (2d Cir. 1973), ought to approach gingerly the task of invalidating reasons given by the Board for declining to permit early release.

Whether the seriousness of the offense could properly be a basis for parole denial exclusive of all other factors, as the Government contends, is a question that need not be decided in this case. Although petitioner was given a single reason for denial of parole on the standardized form he received, the affidavit and report submitted to the Court demonstrate that the Board's present system involves consideration of additional factors, and justify a conclusion that such factors were present in this case.

Chairman Sigler's affidavit and the NCCD Report outlined the Board's current approach to parole decision-making. A significant feature of this approach is the use of a table of guidelines for parole decision-making. A table has been constructed to indicate approximate ranges of time to be served for various combinations of two factors (NCCD Report, appx. E) (set out in full as appx. 2, *infra*). The first is severity of the offense, and the second is characteristics of the offender. Offenses have been grouped in six rows of categories from low to greatest severity. Offender characteristics have been grouped in four volumns of categories from low to very high probability of favorable parole performance. At the intersections of each variable, the table sets out, in multi-month ranges, different time periods of incarceration that are to serve as a guide for the decision-maker considering a prisoner with particular offense severity and offender characteristics.[3] For example, for a prisoner in the second most favorable category of offender characteristics and the lowest category of offense severity, the range of time before release is eight to twelve months.

Use of the table does not preclude individualized consideration of each prisoner's case. This is evident for two reasons. First, determination of the normal range of time for each prisoner requires consideration of his individual characteristics in order to locate the appropriate category of offender characteristics. Second, in the first four months of the pilot project, while 63% of the hearing examiner decisions were within the guidelines, 22.5% were below and 14.5% were above the guidelines. (Sigler affidavit 2; NCCD Report 16, Table II). The table is only a guide, and the hearing examiners are to indicate reasons for a decision outside the ranges set out in the table.

Unfortunately, it is not readily apparent how the new system was used to reach a decision in petitioner's case.[4]

---

3. As the NCCD Report makes clear, the table currently in use was not constructed by making discrete decisions as to what the appropriate time periods ought to be for each combination of variables. Instead researchers initially reviewed two years' worth of Board parole decisions and constructed a table to reflect what had actually been happening. Such an approach is of course open to the criticism that it might simply codify whatever irrationality has permeated prior decision-making. However, it is certainly desirable for decision-makers to have a tabular representation of what they have in fact been doing to serve as a frame of reference against which future decisions can be made. Moreover, the Board has already exercised its judgment to vary the table from the one initially prepared, *compare* NCCD Report 11, Table I, *with* NCCD Report 26, Appx. D, and plans to continue doing so, NCCD Report 17–19.

4. It is not even absolutely certain that the table was used at all by the examiners who considered petitioner's parole. Chairman Sigler's affidavit, dated October 10, 1973, states that the paroling policy guidelines are "presently" in use, without indicating when their use began at Danbury Federal Correctional Institution. The new pilot project regulations specifically refer to use of guidelines, 28 C.F.R. § 2.24(i) (revised). However, the NCCD Report states that use of

His offense, failure to appear, is not listed in any of the categories of offense severity. A footnote to the table advises that in such a situation, the category for similar offenses is to be used. In the original table, the third category of offenses, "Moderate Severity," includes escape; the revised table omits the offense of escape entirely.[5] Thus, it cannot be conclusively determined from the meager record available whether the decision to require petitioner to serve the full eighteen months was based on the table, or on a determination that his case justified a longer period prior to release than the table would indicate.

The inference most reasonable to this Court, however, is that the table was used and that no extraordinary factors were present to justify departing from it. Since severity of the offense is one of the factors used in determining the guideline range applicable to a prisoner, it is unlikely that this factor would be given as a reason for selecting a time period greater than that indicated by the guidelines.[6] If petitioner's offense is considered to be within the "Moderate Severity" category, the range of guideline time periods is twelve to thirty months, with the time period range for the second most favorable category of offender characteristics being sixteen to twenty months. Petitioner's eighteen-month sentence falls in the middle of this range. Apparently petitioner was considered to fall into the third lowest category of offense severity and the second highest category of offender charac-

teristics. Then the absence of any special factors led to a decision to deny parole and continue to expiration, since eighteen months fell within the guideline range.

The reason for parole denial—that release would depreciate the seriousness of the offense—was apparently selected simply as a shorthand way of stating that the guideline table had been used, perhaps on the theory that in petitioner's case offense severity was the controlling factor in locating his guideline range on the table. If this is so, severity of the offense was not relied on by the Board to the exclusion of all other factors, since the guideline table requires consideration of offender characteristics.

Petitioner contends that if in fact other factors were considered, the Board's failure to communicate them constitutes a violation of the rules of the pilot project and of due process. Obviously, specification of the single reason given to petitioner is not satisfactory. It is neither a complete representation of the Board's decision nor a stimulus to further rehabilitation on the part of the prisoner. It would be far preferable for the Board to make the table of guidelines known to inmates and then, if the guidelines are for some reason not followed, give reasons for the departure. It would also be helpful, insofar as practicable, to have the inmate understand how his offender characteristics are rated. But the issue here is not whether the Board could have made its decision

decision guidelines was one of the innovative features of the pilot project as originally started in October, 1972. NCCD Report 13. That statement, in the absence of any contrary evidence, adequately supports the inference that the guidelines were used when petitioner was denied parole in July, 1973.

5. The first category of the revised table, "Low Severity," includes something called "walkaway," an offense not readily identifiable in the Criminal Code. Perhaps this covers the type of technical escape that occurs when a prisoner on work release or furlough is late returning to custody. There is no in-

dication in the record that petitioner's offense falls within such a category.

6. Though there is no basis on this record for concluding that an incarceration period greater than the appropriate guideline range was selected, the reason given by the Board does not preclude such a possibility. Since the table is, for the most part, only a reflection of past parole decisions, it is possible that the decision-makers in petitioner's case consciously decided that an adequate deterrent effect with respect to petitioner's crime would be achieved only by incarcerating him for a longer period of time than had occurred, on the average, in prior cases.

more understandable; it is simply whether it has acted unlawfully.

■ Neither the pilot project nor the Constitution require the Board to state *all* the reasons for its decisions under the project merely because it chooses to state one or more reasons. The pilot project rules clearly allow for specification of a single reason.[7]

■ An experimental program such as the pilot project ought not to be subject to the same standards of judicial scrutiny as a program administered under regulations of general applicability. Certainly the requirements of due process are shaped by the context in which decision-making occurs. See Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). The requirements of the pilot project and of due process are satisfied if a significant factor in the parole decision is identified, even if all reasons are not set forth. Whether such an approach would be appropriate when, as expected, the new regulations are extended nationwide need not be considered. But the Board is entitled to wide latitude in developing and applying in a regional pilot project new procedures that concern a decision involving such broad discretion as the granting of parole.

■ Petitioner contends that depreciating the seriousness of the offense cannot lawfully be even included among the reasons for a parole decision. The Board views this factor as relevant to its second statutory criterion. This is apparent from the new pilot project regulations which specify as an appropriate reason for parole denial: "(1) Release at this time would depreciate the seriousness of the offense committed and would thus be incompatible with the welfare

of society." 28 C.F.R. § 2.15(a)(1) (revised). Petitioner reads the second criterion as if it were protection of society from future acts of the inmate. (Pet.Br. 5). That reading duplicates the first criterion. When Congress permitted the Board to consider the welfare of society after determining whether the prisoner was likely to be law-abiding upon release, it did not preclude the Board's consideration of general deterrence, the concern that an early release of one charged with a serious offense might lessen the deterrent effect upon others contemplating the same offense. At a minimum that is a reasonable construction to have been made by the agency administering the statute. *Cf.* Thorpe v. Housing Authority of City of Durham, 393 U.S. 268, 276, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Power Reactor Development Co. v. International Union of Electrical, Radio and Machine Workers, AFL–CIO, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).

■ Whether and to what extent general deterrence should be considered in parole decisions as a matter of policy is not a matter for this Court. See Frankel, Lawlessness in Sentencing, 41 Cinc.L.Rev. 1, 41–42 (1972). So long as the factor is within the discretion vested in the Board by Congress a parole decision relying upon it is immune from judicial interference.

Petitioner is really contending that the parole decision must focus exclusively on the prisoner's progress toward rehabilitation, and that such an approach precludes the designation of any time period as a minimum period to be served in view of the seriousness of a particular offense. The Board, through its Chairman, stresses that in fact absolute minimums are not used (Sigler affidavit 3–4), and there is no evidence here that all or even a sizable number of prisoners

---

7. The Board is expected to review the hearing examiner's decision, and transmit to the institution "the decision of the Board along with *the reason* for making this decision. The decision along with the reasons will then be communicated to the inmate, hopefully as soon as two days but again no later than five days. . . . " (Emphasis added). B.P.O.M. 40100.14.

sentenced for the offense of failure to appear have been required to serve eighteen months before release. But it is apparent that in some situations parole decisions will establish a minimum sentence. Chairman Sigler acknowledges that in some cases "offense severity will so outweigh favorable risk that a prisoner serving an exceptionally short sentence will not be paroled. . . ." (Sigler affidavit 1–2).

For example, some courts, including this one, often use the provisions of 18 U.S.C. § 4208(a)(2) with respect to long sentences for armed bank robbery. This is done out of a concern that no one should be imprisoned for a long time without the availability of administrative leniency (short of the pardoning power) in the event of totally unforeseen circumstances, such as terminal illness.[8] In such event, § 4203 surely does not require the Board to release after three months (the normal time when (a)(2) prisoners are first considered for parole) a bank robber sentenced to twenty years simply because for three months he has been a model prisoner. The Board must make a judgment as to an appropriate minimum time period for such prisoners, always retaining the discretion to release at an even earlier date in the truly extraordinary case. Such an approach does not, as petitioner alleges, interfere with the sentencing jurisdiction of the courts. If a court wants a defendant to serve a brief sentence or no sentence at all, it has ample techniques for accomplishing that result.

Finally, petitioner contends that the decision to continue him to expiration violates the provisions of 18 U.S.C. § 4208(a)(2). Even if the (a)(2) provision requires not only early consideration for parole but also a periodic review of reasonable frequency, an issue not decided in this case, this petitioner has no complaint. His mandatory release date will arrive, at the latest, not quite four months after the decision to continue

him to expiration. In no event is he entitled to more frequent consideration.

For the reasons stated relief must be denied to this petitioner. However, this Court expresses the hope that as the Board continues refining the new procedures it has adopted, it will take steps to make both prisoners and reviewing courts more informed about how these procedures work in individual cases. The petition is dismissed.

## APPENDIX I

### AFFIDAVIT

I, MAURICE H. SIGLER, being duly sworn, depose and state that:

I am Chairman of the United States Board of Parole with offices located at 101 Indiana Avenue, NW., Washington, D. C. This affidavit will set forth the method of operation of the paroling policy guidelines adopted by the Board and presently in use in parole decision making.

The Parole Board's guidelines indicate the approximate range of time to be served for various combinations of offense severity and offender characteristics (offender characteristics refer to risk of parole violation or recidivism). In other words, there is a balancing of offense severity against risk of violation. Risk of parole violation must be included in every use of the guidelines to determine how long an individual prisoner will be held, though it may happen in individual cases that offense severity will so outweigh favorable risk that a prisoner serving an exceptionally short sentence will not be paroled, but rather released by mandatory release under the good time law.

The guideline ranges are set for cases with good institutional performance. A hearing panel may render a decision either above or below the guideline range if it is justified by a sufficient explanation. Circumstances in which the Board may consider decisions below the guide-

---

8. This Court has previously been advised by Chairman Sigler that an explanation from the sentencing court to the Parole Board as to the reasons for an (a)(2) sentence is helpful, since many courts mean many different things by such a sentence.

lines include exceptionally good institutional performance; substantial medical problems; cases in which the subject has been in state custody for a long period on other charge(s); cases calling for deportation only; cases in which the sentencing judge has recommended early parole (Form 792); and cases in which the Board feels that the clinical risk prognosis is substantially better than indicated by the offender characteristics score. (The offender characteristics score is a predictive device, similar in principle to the actuarial tables used by insurance companies.)

That the guidelines have not curtailed use of discretion by the Board is shown by the fact that in the first four months of guideline usage in the pilot project approximately 63 percent of hearing panel recommendations were within the guidelines; 22.5 percent of panel recommendations were below the guidelines; and 14.5 percent of panel recommendations were for decisions above the guidelines.

The guidelines were designed to take into account the statutory criteria for parole consideration in the following manner:

(a) The risk scale relates to the standard of 18 U.S.C. § 4203(a) that there must be a reasonable probability that the prisoner will live and remain at liberty without violating the law.

(b) The consideration of institutional performance relates to the requirement of 18 U.S.C. § 4202 that the prisoner must have observed the rules of the institution in which he has been confined.

(c) The offense severity scale relates to the standard of 18 U.S.C. § 4203(a) that, in the opinion of the Board, release would not be incompatible with the welfare of society. For example, a prisoner who has committed a very serious offense, such as armed robbery, but who is a good parole risk (i. e., no prior record, good work history) would generally not be released after serving three months because, in the opinion of the Board, release at that time would depreciate the seriousness of the offense committed and thus be incompatible with the welfare of society. In fact, prisoners who have committed very high severity offenses who are also judged to have a very high probability of successful parole performance will not generally be released until they have served 26 to 36 months. However, it is important to stress that this is not an absolute minimum; earlier paroles may be granted where there are sufficient reasons such as those described above. Thus, the range of the guidelines is not directly comparable to judicially set minimum sentences, which may not be reduced by Board discretion. The guidelines are simply a statement by the Board of the manner in which it generally intends to exercise its discretion.

A parole system which did not take into account the severity of the offense would generally result in immediate parole grants for the most serious offenses while giving almost no chance of parole at any time for many minor offenders, since offenders who commit the most serious offenses (homicide, assault, rape) often tend to be among the best parole risks, while offenders committing certain less serious offenses (joyriding, check forgery) often tend to be among the poorest risks. Such a policy would certainly, in the opinion of the Board, be incompatible with the welfare of society.

In summary, the guideline concept attempts to generate an explicit paroling policy to lead to more equitable and consistent decisions by structuring discretion within the broad statutory mandate of the Board without removing consideration of each individual case on its merits.

(s) Maurice H. Sigler

Maurice H. Sigler
Chairman
U.S. Board of Parole

See Appendix on next page.

APPENDIX 2

GUIDELINES FOR DECISION–MAKING (ADULT CASES)
AVERAGE TOTAL TIME SERVED BEFORE RELEASE
(INCLUDING JAIL TIME)

| Offense Characteristics * | Offender Characteristics—Salient (Favorable) Factor Score (Probability of Favorable Parole Outcome) | | | |
| --- | --- | --- | --- | --- |
| | (9–11) Very High | (6–8) High | (4–5) Fair | (0–3) Low |
| **Category A—Low Severity Offenses** Immigration law violations; Walkaway; Minor theft (includes larceny and simple possession of stolen property less than $1,000) | 6–10 months | 8–12 months | 10–14 months | 12–16 months |
| **Category B—Low/Moderate Severity Offenses** Alcohol law violations; Selective Service; Mann Act (no force—commercial purposes); Theft from mail; Forgery/Fraud (less than $1,000); Possession of marijuana (less than $500); Passing/Possession of counterfeit currency (less than $1,000) | 8–12 months | 12–16 months | 16–20 months | 20–25 months |
| **Category C—Moderate Severity Offenses** Simple theft of motor vehicle (not multiple theft or for resale); Theft, Forgery/Fraud ($1,000–$20,000); Possession of marijuana ($500 or over); Possession of Other "Soft Drugs" (less than $5,000); Sale of marijuana (less than $5,000); Sale of Other "Soft Drugs" (less than $500); Possession of "Heavy Narcotics" (by addict—less than $500); Receiving stolen property with intent to resell (less than $20,000); Embezzlement (less than $20,000); Passing/Possession of counterfeit currency ($1,000–$20,000); Interstate transportation of stolen/forged securities (less than $20,000) | 12–16 months | 16–20 months | 20–24 months | 24–30 months |
| **Category D—High Severity Offenses** Theft, Forgery/Fraud (over $20,000); Sale of marijuana ($5,000 or more); Sale of Other "Soft Drugs" ($500–$5,000); Sale of "Heavy Narcotics" to support own habit; Receiving stolen property ($20,000 or over); Passing/Possession of counterfeit currency (more than $20,000); Counterfeiter; Interstate transportation of stolen/forged securities ($20,000 or more); Possession of "Heavy Narcotics" (by addict—$500 or more); Sexual act (fear—no injury); Burglary (Bank or Post Office); Robbery (no weapon or injury); Organized vehicle theft | 16–20 months | 20–26 months | 26–32 months | 32–38 months |
| **Category E—Very High Severity Offenses** Extortion; Assault (serious injury); Mann Act (force); Armed robbery; Sexual act (force—injury); Sale of "Soft Drugs" (other than marijuana—more than $5,000); Possession of "Heavy Narcotics" (non-addict); Sale of "Heavy Narcotics" for profit | 26–36 months | 36–45 months | 45–55 months | 55–65 months |
| **Category F—Greatest Severity Offenses** Aggravated armed robbery (or other felony)—weapon fired or serious injury during offense; Kidnapping; Willful homicide | (Information not available due to limited number of cases) | | | |

\* Notes: (1) If an offense behavior can be classified under more than one category, the most serious applicable category is to be used. If an offense behavior involved multiple separate offenses, the severity level may be increased. (2) If an offense is not listed above, the proper category may be obtained by comparing the severity of the offense with those of similar offenses listed. (3) If a continuance is to be recommended, allow 30 days (1 month) for release program provision.