**Frank GRASSO**

v.

**John J. NORTON, Warden, Federal Correctional Institution, Danbury, Connecticut, et al.**

**Marcelo DIAZ**

v.

**John J. NORTON, Warden, Federal Correctional Institution, Danbury, Connecticut, et al.**

**Civ. Nos. B-813, B-74-87.**

United States District Court,
D. Connecticut.

April 30, 1974.

Dennis E. Curtis, New Haven, Conn., for petitioners.

Barry J. Cutler, Asst. U. S. Atty., New Haven, Conn., for respondents.

## MEMORANDUM OF DECISION ON MOTIONS FOR SUPPLEMEN-TAL·RELIEF

NEWMAN, District Judge.

In these two unrelated cases raising issues concerning the procedures of the United States Board of Parole in the administration of 18 U.S.C. § 4208(a)(2), both sides have filed motions seeking supplemental relief after the initial decisions. Grasso v. Norton, 371 F.Supp. 171 (D.Conn.1974) (hereafter *Grasso I*); Diaz v. Norton, 376 F.Supp. 112 (D.Conn.1974).

*Grasso I* ruled that an (a)(2) prisoner, who is eligible for parole at any time, could not receive less effective parole consideration than a non-(a)(2) prisoner, who is eligible for parole only after serving one-third of his sentence. 18 U.S.C. § 4202. Since the Board, after considering Grasso for parole after only three months of his three-year sentence, had continued him to expiration, this Court ruled that he was entitled to parole consideration at the one-third point of his sentence. At issue now is whether the parole consideration to be given (a)(2) prisoners like Grasso at the one-third point must be a hearing at which the prisoner and his representative are present, or can be a review of the prisoner's file supplemented by a progress report. In *Diaz* the Government contends that if compliance with *Grasso I* requires a hearing, such a ruling should be given prospective effect only.

On March 7, 1974, a Court hearing was held in *Grasso*, at which testimony was received from the staff psychiatrist at F.C.I., Danbury, petitioner's case

worker, and petitioner. In *Diaz*, a Court hearing was held on April 8, at which Peter Hoffman, the Board's director of research, testified. The Government offers his testimony also on the issues pending in *Grasso*.

## I.

### *Procedure in (a)(2) Cases*

At the time of this Court's decision in *Grasso I*, the procedures of the Board provided that parole consideration was to be accorded at hearings conducted at an inmate's institution before two hearing examiners. 28 C.F.R. § 2.15. Both the inmate and his representative have a right to be present. As will be discussed in more detail, part III, *infra*, the Board initially responded to this Court's decision in *Grasso I* by scheduling a hearing for Grasso at F.C.I., Danbury, to be held on February 28, 1974. The Board then changed its mind and decided to cancel the hearing and consider Grasso's case on March 1, 1974, on the papers in his file, supplemented by a progress report prepared by his case worker. This procedure preceded an instruction to the Board's staff, issued March 4, 1974, which purported to formalize the system of file review for (a)(2) prisoners at the one-third point of their sentences. See Diaz v. Norton, *supra*, 376 F.Supp. at 116, n. 4.

The proposed system of file review for (a)(2) prisoners at the one-third point of their sentences is a significant improvement over the Board's prior practice of giving consideration, after the initial hearing, only at a date well beyond the one-third point and, in some instances, no further consideration at all.[1] Nevertheless, the file review still runs counter to the purposes of § 4208(a)(2) because it accords (a)(2) prisoners a form of parole consideration less satisfactory than that accorded non-(a)(2) prisoners. The differences

are significant. The testimony disclosed that a parole hearing at F.C.I., Danbury, normally lasts fifteen to twenty minutes. During this time the hearing examiners question the prisoner closely. Thus, at the one-third point of his sentence, a non-(a)(2) prisoner has the opportunity to speak directly with the examiners and respond to their questions. Often his case worker is present to respond to the examiners' inquiry. The (a)(2) prisoner, remitted to a file review, loses this opportunity for direct personal contact. The fact that he had a hearing shortly after he arrived at the institution is no answer, because the very brevity of his time served before that first hearing precluded any realistic opportunity to persuade the examiners that his institutional progress merited parole.

There is another, more subtle difference. When the non-(a)(2) prisoner has his hearing at the one-third point of his sentence, the examiners conscientiously decide what parole decision is appropriate. However, when the (a)(2) prisoner gets a file review at the one-third point, after having first received a setoff to a date well beyond the one-third point, the Board is starting with a slightly stacked deck. The decision is not whether and when should he be paroled; it is whether the setoff previously given should be changed. In all processes of decision-making, it is more difficult to undo a decision already made, than to decide the same issue on a clean slate.

Between the lines of both the Government's brief and the Hoffman testimony emerges what is perhaps the main reason why the Board prefers a file review to an institutional hearing for (a)(2) prisoners at the one-third point of their sentences. It is simply that because of the growing reliance by the Board upon its guideline table, see Battle v. Norton, 365 F.Supp. 925, 934, Appx. 2 (D.Conn.

---

[1]. Hoffman testified that at initial parole hearings for (a)(2) prisoners in the Northeast region from October, 1973, to March, 1974, 51% of the prisoners were given a setoff past the one-third point of their sentences and an additional 27% were continued to expiration.

1973), there is only a slight likelihood that a hearing at the one-third point will vary the decision from the setoff given at the first hearing. Hoffman testified that if all parole decisions that could possibly be considered to be within the Board's guidelines are counted as such, the percentage of all parole decisions that fall within the guideline table is now running between 92% and 94%. That is a marked increase from an earlier estimate of 63%. See Battle v. Norton, *supra*, 365 F.Supp. at 933, Appx. 1. Just as significant, Hoffman testified that the Board grants parole in subsequent hearings in 90% of the cases, usually at the second hearing.

It is thus apparent what is happening. The Board considers an (a)(2) prisoner after two or three months of his sentence and at that hearing frequently continues him to a point at or just prior to the length of confinement indicated for that prisoner by the guideline table. Then at the second hearing, parole is often granted, especially for sentences in the two to five year range. Understandably, the Board prefers not to bother with institutional hearings at the one-third point of the sentence, since it has already used the guideline table to select the likely parole date, and has given a setoff consistent with that date. The one-third point of the sentence is irrelevant to the Board's timetable for (a)(2) prisoners.

As Hoffman candidly testified, a principal advantage of an (a)(2) sentence is simply that the prisoner finds out at an early date in his sentence what the guideline table specifies for his case.[2]

Despite the current heavy reliance by the Board on the guideline table, an (a)(2) prisoner cannot be denied the opportunity to urge in person, at the one-third point of his sentence, that he is entitled to parole, just as the non-(a)(2) prisoner can contend. The Board has

publicly stated in its most recent biennial report that it has adopted an "exhaustive list of factors which it takes into consideration when parole is considered" including "behavior changes," "the institutional experience," and "general personal adjustment." See "The United States Board of Parole" (1972) 10. A court is entitled to assume that the Board is not allowing its guideline table to eliminate consideration of such vital factors. There can be little doubt that such factors are better considered as a result of a personal interview than from a file review.

■ Due process may not require an in-person parole hearing for any prisoners. But § 4208(a)(2) requires that (a)(2) prisoners not be denied at the one-third point of their sentences as effective a hearing as is accorded at the same point to non-(a)(2) prisoners, at least where the interval between an initial hearing and the one-third point is substantial. See *Grasso I, supra,* 371 F.Supp. at 174.

## II.

### Retroactive Application

The Government's motion for reconsideration in *Diaz* urges that the decision in *Grasso I* be given prospective effect only. Presumably, this would mean that the only (a)(2) prisoners who would be entitled to institutional hearings at the one-third point of their sentences would be those who reached the one-third point after the date of *Grasso I*, or perhaps only those whose initial parole hearing occurred after such date. In support of this contention, the Government cites one of the criteria for determining retroactivity set forth in Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967), the "effect on the administration of justice."

---

2. Hoffman also emphasized that the (a)(2) provision has resulted in the release of some prisoners prior to the expiration of one-third of their sentences. He estimates this has occurred in 17%–18% of the (a)(2) prisoners in the Northeast region between October, 1973, and March, 1974. It is not clear how many of these were paroled because the guideline table indicated that they had served the recommended time.

The criteria listed in *Stovall* for determining retroactivity were developed by the Supreme Court in a series of cases beginning with Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). *Linkletter* was concerned with "the effect of the subsequent ruling of invalidity on prior final judgments when collaterally attacked." *Id.* at 627. In this case, Diaz is not seeking the benefit of *Grasso I* to attack a prior final judgment. He did not receive a parole hearing at the one-third point of his sentence, and all he seeks is the right to have such a hearing. While the Supreme Court has indicated that determinations of prospectivity are not limited to collateral attacks upon final criminal convictions, it has catalogued the pertinent factors in terms somewhat different from those identified in *Stovall* when considering cases other than criminal convictions. See Chevron Oil Co. v. Huson, 404 U.S. 97, 106–107, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). For example, retroactivity has been denied to avoid "substantial inequitable results," Cipriano v. City of Houma, 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), a standard that appears more rigorous than identifying a burden on the administration of criminal justice. Surely no substantial inequitable results will result if *Grasso I* is applied retroactively; such risk arises only if it is applied prospectively.

To whatever extent an effect on the administration of justice is relevant, this criterion provides no basis for denying prisoners like Diaz the benefit of the ruling in *Grasso I*. The Government's argument rests on a claim of administrative inconvenience to the Parole Board. Hoffman estimated the dimensions of the burden. On the assumption that *Grasso I* is followed nationwide, he started with the approximately 2,800 prisoners who received (a)(2) sentences in 1972. To this number he applied 78%, the percentage of (a)(2) prisoners in the Northeast region who have been given a setoff beyond the one-third point of their sentence or continued to expiration. See note 1, *supra*. This produced 2,164 instances where he thought *Grasso I* would require a new hearing. Compared to the Board's 1972 total of 12,694 institutional hearings, he concluded the additional hearings would be burdensome.

Actually, the estimate of 2,164 cases includes many that do not require a special hearing as a result of *Grasso I*. If the (a)(2) sentence is relatively short, a year and a day, for example, *Grasso I* does not require a hearing at the one-third point, which will occur very shortly after the Board's initial hearing. See Grasso v. Norton, *supra*, 371 F.Supp. 171; Lupo v. Norton, 371 F.Supp. 156, 164 n. 5 (D.Conn.1974). If the sentence is ten years or longer, *Grasso I* adds nothing to the Board's burden, because under the Board's existing policy, a setoff cannot be given for longer than three years. Hence the Board's policy, not *Grasso I*, already requires subsequent hearings for such prisoners. No figures were developed to indicate how many (a)(2) prisoners receive either relatively short or very long sentences, but plainly the estimate of 2,164 new hearings is subject to some reduction.

The estimate of added hearings is subject to even further reduction, because not every prisoner eligible for a parole hearing will necessarily want one under the Board's rules. See Rules of United States Board of Parole, p. 13 (1971). For example, an (a)(2) prisoner given a setoff beyond the one-third point of his sentence may not want a *Grasso* hearing at the one-third point if he then has only one or two months before his setoff date. Since prisoners are rapidly becoming familiar with the Board's use of its guideline table, such a prisoner may well prefer to wait until his setoff date, when parole is likely, rather than insist on a hearing at the one-third point. Even if hearings are held in such circumstances, there will not inevitably be an extra hearing; in some instances the Board may decide to grant parole at a hearing held at the

one-third point, rather than wait to take the same favorable action at the setoff hearing scheduled only a month or two later.

The number of added hearings that will actually take place as a result of *Grasso I*, while not precisely ascertainable, is somewhat below the Hoffman estimate and surely not large enough to pose an administrative problem beyond the Board's capacity. There is thus insufficient demonstration that *Grasso I* should have only prospective application.[3]

## III.

### Remedy in Grasso's Case

Finally, the Government urges that if the file review system is not sufficient to comply with § 4208(a)(2), then Grasso should be entitled now only to an institutional hearing. Grasso contends that he is entitled to release because the Board failed to provide the hearing required by *Grasso I*, and the terms of the order entered in that case require his release unless there is compliance with the order.[4]

After entry of the order, developments occurred in both the judicial and administrative processes. The Government sought and obtained from this Court a limited stay. That stay, drafted by Government counsel, stayed the judgment until Feburary 21, 1974, "so that the parole board may have an opportunity to dispatch hearing examiners to the Federal Correctional Institution at Danbury." Subsequently, the Court of Appeals granted a further stay until March 1, 1974, stating orally that the purpose of the stay was to give the Board time to send examiners to Danbury for Grasso's hearing.

At F.C.I., Danbury, Grasso's case worker learned on February 25 that hearing examiners would be coming to the institution to hold a hearing on Grasso on Feburary 28. Later he learned that the hearing date was advanced to February 27. On February 26, Grasso was told by an official at Danbury that the hearing was cancelled, that the Board had decided to appeal this Court's decision, and that he would be released on March 1, apparently as a consequence of this Court's judgment, as stayed by the Court of Appeals. On February 27, Grasso learned that the Board had requested that a special progress report be prepared and sent to Washington, but he was still assured of his March 1 release. On February 28, Grasso was given sign-out forms and told by prison officials to secure the necessary signatures, which he did that same day. Upon completion of the forms, Grasso then signed parole and mandatory release papers in preparation for his release the following morning, March 1. He was allowed to call his wife to arrange to pick him up the next morning. After all this, Grasso was informed on the afternoon of February 28 that he would not be released because of some hearing on his case in Washington. This turned out to be the file review, which was decided adversely to Grasso on March 1. On March 4, this Court released Grasso on personal recognizance pending determination of this case.[5]

The Government's principal contention is that this Court's original decision of

3. Apart from effect on the administration of justice, the other two criteria identified in *Stovall* as pertinent to retroactivity, the purpose of the new standard and the extent of law enforcement reliance on the previous standard, both weigh heavily against giving *Grasso I* only prospective application.

4. The Memorandum of Decision concluded as follows:
   Accordingly, it is hereby ordered that the writ will issue discharging the. petitioner unless within thirty days the Board rescinds its decision to continue petitioner to expiration and substitutes in lieu thereof a new order continuing petitioner to a date at or prior to the expiration of one-third of his sentence, at which time he will be entitled to parole consideration.

5. At that point Grasso had served slightly more than a year of his three-year sentence.

February 5, 1974, did not explicitly mandate a hearing but only "parole consideration." Since the Board's then current regulations provided that parole consideration was to be given at an institutional hearing conducted by two hearing examiners, it is difficult to see what doubt existed. The whole point of the Memorandum of Decision was that (a)(2) prisoners are entitled to the same hearing at the one-third point of their sentences as non-(a)(2) prisoners. In any event, it is apparent that all concerned read this Court's order to require an institutional hearing. This is reflected in the terms of the stay order drafted by Government counsel and entered in this Court, the further stay granted by the Court of Appeals, and the initial decision by the Board of Parole in informing F.C.I., Danbury, that hearing examiners were to arrive February 28.

■ Plainly what happened next is that the Board decided not to hold a hearing but to rely instead on a file review. It did not suddenly start wondering whether this Court had ordered an institutional hearing. If the Board thought a file review might be an acceptable alternative to the hearing this Court had ordered, its proper remedy was to apply for modification of this Court's February 5 order. Walker v. City of Birmingham, 388 U.S. 307, 316–317, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). Instead it took the risk that Grasso would be released if its file review system was not deemed the equivalent of the hearing that had been ordered.[6] In the absence of compliance with the February 5 order, there is no reason why, as specified in that order, in the event of noncompliance, a writ

should not issue discharging the prisoner.[7] Whatever inclination there might be to mitigate this consequence is entirely dispelled by the unseemly treatment accorded Grasso in assuring him of his release up to a point within hours of his scheduled departure from prison, only to renege at the last moment.

Accordingly, in Civil No. B–813 it is hereby ordered that petitioner is permanently discharged from respondent's custody, and the respondent's motion for reconsideration in Civil No. B–74–87 is denied.

make the file review completely effective. For example, the progress report prepared at Danbury and sent to the Board in Washington stated that "a neuropsychiatric summary and a medical summary will be attached to this progress report." However, Grasso's case worker testified that he did not send these reports because he expected to hand them to the hearing examiners who he understood were coming to Danbury.

6. Even if the file review system were acceptable in the future, that would not afford a reason for denying Grasso the hearing this Court had ordered as the alternative to discharge.

7. The Board's shift from an institutional hearing to a file review not only failed to comply with this Court's order, but it also occurred with such speed that it impaired the ability of prison officials at Danbury to