Frank GRASSO, Appellee-Petitioner,

v.

John J. NORTON, Warden, Federal Correctional Institution, Danbury, Connecticut, et al., Appellants-Respondents.

No. 373, Docket 74–1222.

United States Court of Appeals, Second Circuit.

Argued Dec. 10, 1974.

Decided June 23, 1975.

Thomas P. Smith, Asst. U. S. Atty., for the District of Connecticut (Peter C. Dorsey, U. S. Atty., for the District of Connecticut), for appellants-respondents.

Michael J. Churgin, New Haven, Conn. (Dennis E. Curtis, Stephen Wizner, New Haven, Conn., and William J. Genego, Yale Law School), for appellee-petitioner.

Before FEINBERG and MULLIGAN, Circuit Judges, and BRYAN, District Judge.[*]

FREDERICK van PELT BRYAN, District Judge:

The Warden of the Federal Correctional Institution at Danbury, Connecticut and the United States Board of Parole appeal from a judgment of the United States District Court for the District of Connecticut (Jon O. Newman, J.) in a habeas corpus proceeding brought under 28 U.S.C. § 2241. The judgment directed the discharge from federal custody of appellee Frank Grasso, a prisoner at the Danbury institution.

Grasso was serving a sentence imposed under 18 U.S.C. § 4208(a)(2) pursuant to which the court fixed a maximum sentence of imprisonment to be served by Grasso, and specified that he would become eligible for parole at such time as the Board of Parole might determine. The appeal presents troublesome questions as to the duties and responsibilities of the Board of Parole to prisoners who, like Grasso, have been sentenced pursuant to Section 4208(a)(2).

On February 13, 1973 Grasso was sentenced by Chief Judge Foley in the United States District Court for the Northern District of New York on a conviction for distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Three statutory alternatives as to Grasso's eligibility for parole were open to the sentencing court. Had a straight term of imprisonment been imposed under 18 U.S.C. § 4202, Grasso could have been released on parole only after serving one-third of his term.[1] Under 18 U.S.C. § 4208(a)(1), if Grasso had been sen-

---

* Frederick van Pelt Bryan, of the Southern District of New York, sitting by designation.

1. 18 U.S.C. § 4202 provides:
   A Federal prisoner, other than a juvenile delinquent or a committed youth offender, wherever confined and serving a definite term or terms of over one hundred and eighty days, whose record shows that he has observed the rules of the institution in which he is confined, may be released on parole after serving one-third of such term or terms or after serving fifteen years of a life sentence or of a sentence of over forty-five years.

tenced to imprisonment for more than one year the court could have designated a minimum term "at the expiration of which the prisoner shall become eligible for parole."[2] Chief Judge Foley elected to use a third alternative, provided by Section 4208(a)(2).[3] Pursuant to that section Grasso was sentenced to a maximum term of three years' imprisonment with a special parole term of two years to follow, and the court specified that he should become eligible for parole at such time as the Board of Parole might determine.

In sentencing Grasso, Chief Judge Foley stated:

I am going to sentence you to a period of three years to an institution designated by the Attorney General, but the sentence in this type of case is in your favor. You are sentenced under Title 18, Section 4208(a)(2), which means that the Board of Parole may determine your eligibility for parole. It depends upon your behavior at Danbury, . . . . The Board of Parole will determine when they think you are eligible to be released to the public.

Grasso then began service of his sentence at Danbury.

Under the procedure followed by the Parole Board, prisoners sentenced under 18 U.S.C. § 4208(a)(2) ((a)(2) prisoners), were given a prompt initial parole hearing before a panel of Parole Board examiners. This initial hearing was primarily for purposes of evaluation and was held before any review as to institutional performance was possible. Parole was seldom granted at such hearings.[4]

On May 7, 1973, less than three months after his incarceration, Grasso was given an initial parole hearing before Board of Parole examiners at Danbury. On May 9, 1973 he was notified that parole was denied and that his confinement would be "continued to expiration" of the maximum three-year sentence which had been imposed, without further parole hearing.[5]

On July 16, 1973 Grasso filed a pro se petition for a writ of habeas corpus in the District Court of Connecticut, alleging that the Board of Parole had wrongfully denied him parole. Counsel was appointed to represent him. On December 19, 1973, after all administrative remedies had been exhausted, Grasso, through his counsel, filed an amended petition for a writ of habeas corpus, alleging that the action of the Parole Board in ordering his sentence to be continued to expiration on the basis of the initial hearing without giving him further parole consideration on a periodic basis was arbitrary and contrary to law. The amended petition sought Grasso's release from custody, a declaratory judgment that (a)(2) prisoners were entitled

---

2. 18 U.S.C. § 4208(a)(1) provides:

(a) Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interests of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may (1) designate in the sentence of imprisonment imposed a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than, but shall not be more than one-third of the maximum sentence imposed by the court.

3. 18 U.S.C. § 4208(a)(2) provides, in relevant part:

(a) Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interests of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may . . . (2) . . . fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may become eligible for parole at such time as the board of parole may determine.

4. *See* n. 13, *infra,* at p. 35.

5. 28 C.F.R. § 2.21 provided, at the time, that special review of parole eligibility would be granted at any time "any new information of substantial significance" was received by the Board. (This provision is now to be found in 28 C.F.R. § 2.28.) Unless such extraordinary information was received by the Board, Grasso would not have been granted parole consideration at any time after the initial hearing of May 7, 1973.

to periodic parole hearings during their terms of confinement and mandamus directing the Board to grant Grasso a hearing at which he would be considered for parole.[6]

On February 4, 1974, Judge Newman held, in substance, that the determination of the Board to continue Grasso to the expiration of his sentence, without further parole consideration, was contrary to the purposes of Section 4208(a)(2) and unlawful. Judge Newman reasoned that the Board's determination deprived Grasso of an opportunity to demonstrate institutional performance and program achievement which might justify his release on parole as Section 4208(a)(2) had intended, and in fact placed Grasso in a worse position than a prisoner given a straight sentence under Section 4202 (a 4202 prisoner), who was entitled to a hearing at the one-third point of his sentence. Judge Newman issued a conditional writ discharging Grasso "unless within thirty days the Board rescinds its decision to continue petitioner to expiration and substitutes in lieu thereof a new order continuing petitioner to a date at or prior to the expiration of one-third of his sentence, at which time he will be entitled to parole consideration." *Grasso v. Norton*, 371 F.Supp. 171, 175 (D.Conn.1974) (*Grasso I*).

The Warden and the Board filed a notice of appeal from the conditional writ and applied to the district court for a stay pending appeal. On February 11, 1974, Judge Newman granted a stay until February 21 "so that the Parole Board may have an opportunity to dispatch hearing examiners" to Danbury to give Grasso an institutional hearing. On February 19, 1974 this court granted a further stay until March 1, 1974 for the same purposes.

Before the expiration of the stay, the Board of Parole advised Danbury that it was sending hearing examiners there to conduct an institutional parole hearing in Grasso's case on February 28, 1974. Grasso was so advised.

On February 25, however, Grasso was informed that the hearing at Danbury was cancelled since the Board intended to pursue its appeal from the conditional writ, but that he would be released from custody on March 1. On February 28, after Grasso had completed the necessary forms in preparation for his release the next day, and had arranged for his wife to pick him up, he was advised that he would not be released but that the Parole Board would conduct a "file review" on his case in Washington. On March 1, 1974, there was a file review of Grasso's case at which he was again denied parole and he was again continued to "expiration of sentence".

After the denial of parole at the file review, Grasso moved in the district court for release from custody on the ground that the Parole Board had failed to comply with the conditional writ issued by Judge Newman in *Grasso I*. After a hearing to determine whether or not there had been compliance, Judge Newman held that under his decision in *Grasso I* the Parole Board was required to give an (a)(2) prisoner as effective parole consideration as a 4202 prisoner; that under the Board's regulations a 4202 prisoner who had served one-third of his sentence was entitled to a full-scale hearing before two hearing examiners in the inmate's institution at which the inmate and his representative were entitled to be present; that Grasso, as an (a)(2) prisoner who had served one-third of his sentence, was entitled to such a full-scale institutional hearing under the conditional writ issued in *Grasso I*; and, finally, that the procedures of the Board and the file review given on March 1, 1974 in Grasso's case failed to comply with the terms of the conditional writ.

Judge Newman, therefore, directed that Grasso be permanently discharged from federal custody. *Grasso v. Norton*,

---

**6.** The first third of Grasso's maximum sentence of three years was due to expire on or before February 7, 1974.

376 F.Supp. 116 (D.Conn.1974) (*Grasso II*). Judgment was entered accordingly on May 6, 1974. It is the appeal from that judgment which is now before us.

Three issues are presented on this appeal:

1. In the case of a prisoner eligible for parole at such time as the Board of Parole may determine under 18 U.S.C. § 4208(a)(2), may the Board of Parole, on the basis of an initial parole hearing held within three months of incarceration, continue the prisoner beyond one-third of his maximum sentence without further parole consideration?

2. If not, what further parole consideration is such a prisoner entitled to?

3. Did the district court commit reversible error in discharging Grasso from federal custody?

Recent cases dealing with the first and second issues presented here take three divergent positions.

*Garafola* v. *Benson,* 505 F.2d 1212 (7th Cir. 1974), is in accord with the position taken in *Grasso I* and *Grasso II,* that an (a)(2) prisoner whose sentence has been continued beyond one-third of the maximum after an initial parole hearing, like a 4202 prisoner, is entitled to a full-scale institutional hearing at or before the one-third point of his maximum sentence.

*Stroud* v. *Weger,* 380 F.Supp. 897 (M.D.Pa.1974), agrees that an (a)(2) prisoner whose sentence has been continued beyond one-third of the maximum after an initial parole hearing is entitled to additional parole consideration at or before the one-third point of his sentence. However, *Stroud* disagrees with the view that a full institutional hearing is then required, and holds that a file review of the (a)(2) prisoner's case is sufficient.

*Moody* v. *United States Board of Parole,* 390 F.Supp. 1403 (N.D.Ga.1974), *aff'd without opinion,* 502 F.2d 1165 (5th Cir. 1974), expressly disagreed with *Grasso I* and held that the decision of the Parole Board at an initial hearing, that an (a)(2) prisoner's sentence should be continued to expiration of the maxi-

mum term without further parole consideration, was wholly within the discretion of the Board and was not reviewable. The opinion of the district court in *Moody* relied on such Fifth Circuit cases as *Thompkins* v. *United States Board of Parole,* 427 F.2d 222 (5th Cir. 1970); *Tarlton* v. *Clark,* 441 F.2d 384 (5th Cir.), cert. denied, 403 U.S. 934, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971); *Scarpa* v. *United States Board of Parole,* 477 F.2d 278 (5th Cir. 1973) (en banc), *vacated and remanded for consideration of mootness,* 414 U.S. 809, 94 S.Ct. 79, 38 L.Ed.2d 44 (1973), *ordered dismissed as moot* (5th Cir. Nov. 30, 1973) (unreported), and *Gorham* v. *Richardson,* 483 F.2d 71 (5th Cir. 1973), which, in somewhat different contexts, took a very limited view of the scope of judicial review of Parole Board determinations. *Arms* v. *Grunska,* No. 74–232–N (M.D.Ala. Sept. 5, 1974) is to the same effect as *Moody.*

While the appeal in the case at bar was *sub judice* this court in *United States* v. *Slutsky,* 514 F.2d 1222 (2d Cir. 1975), recognized that parole consideration afforded by the Parole Board to (a)(2) prisoners, in the light of recent developments, was likely to depart substantially from the reasonable expectations of the sentencing judge. In *Slutsky,* the defendants had been sentenced pursuant to Section 4208(a)(2) in March of 1973. Motions to reduce the sentences upon the ground that the sentencing judge was laboring under a serious mistake of fact concerning the parole implications of the sentences had been denied below. Defendants appealed from that denial.

Judge Moore, after an analysis of the recent policies and procedures of the Parole Board with respect to (a)(2) prisoners, concluded that "since in all probability the appellants will not receive the parole treatment envisioned by the sentencing judge, there should be an opportunity for reconsideration in light of all recent developments in the area." *Slutsky, supra,* 514 F.2d at 1229. The sentences previously imposed were, there-

fore, vacated and the cases remanded to the district court for resentencing.

## I.

Prior to the enactment of 18 U.S.C. § 4208 in 1958,[7] eligibility of federal adult prisoners for parole was governed, solely by 18 U.S.C. § 4202. Neither the sentencing judge nor the Parole Board had any authority to permit release on parole until the expiration of one-third of the sentence.

Section 4208 introduced the concept of the indeterminate sentence into federal sentencing and parole procedure. Under Section 4208(a), the sentencing judge and the Parole Board were no longer bound by the restriction on parole eligibility prescribed by Section 4202. The sentencing judge, after fixing a maximum sentence, could either fix a minimum term at the expiration of which the prisoner would become eligible for parole (4208(a)(1)), or specify that the prisoner would be eligible for parole at any time (4208(a)(2)). The Parole Board was empowered to grant parole whenever it determined that the prisoner was suitable for release, after the expiration of the minimum sentence under (a)(1) or at any time under (a)(2).

As the Seventh Circuit pointed out in *Garafola* v. *Benson,* 505 F.2d 1212, 1217 (7th Cir. 1974):

A major purpose of any indeterminate sentence provision is to give the Parole Board discretion to determine when a prisoner has reached that point in his rehabilitation process at which he should be released under supervision to begin his readjustment to life in the community. By keeping the minimum low, the prisoner is encouraged "to earn favorable consideration for parole in accord with the public policy embodied in the parole statutes." National Council on Crime and Delinquency, Guides for Sentencing 21 (1963). An additional purpose of indeterminate sentencing is to provide a mechanism for reducing disparity of sentences given by different judges. Both of these goals have long been stressed by commentators and advocates of modified indeterminate sentencing plans for the federal courts. [Citations omitted]

Congress plainly had these purposes in mind when it enacted Section 4208, and particularly Section 4208(a)(2). There is no need to review in detail here the legislative history of the bill, which is reviewed and documented in *Garafola, supra,* at 1217–1218, and in *Grasso I,* at 173–174. It is of particular note, however, that Congressman Emanuel Celler, then Chairman of the House Judiciary Committee and author of the bill, recognized that Section 4202 created "a purely arbitrary limitation which does not take into consideration the varying responses which individual prisoners made to the rehabilitation program carried on in our Federal penal and correctional institutions." Congressman Celler pointed out that Section 4208 would "permit the release under supervision at an earlier date, should a prisoner's response to the rehabilitation justify it." Hearings on H.J.Res. 424, H.J.Res. 425 and H.R. 8923 before Subcommittee No. 3, House Committee on the Judiciary, 85th Cong., 2d Sess., at 5, 6 (1958). Deputy Attorney General Lawrence E. Walsh, speaking for the Department of Justice in support of the bill, explained that "the purpose of this bill is to impose on a defendant a sentence with a broad enough range between the minimum and the maximum so that the people who work with him from day to day in the prison can see his progress and pick that moment when he is best suited to go back to the community and take an active part." Hearings on H.J.Res. 424, H.J.Res. 425 and H.R. 8923 before Subcommittee No. 3, House Committee on the Judiciary, 85th Cong., 2d Sess., at 8 (1958).

Subsection (c) of Section 4208 provides that upon commitment of a prisoner sentenced under subsection (a), the Director

---

7. Public Law 85–752, § 3, August 25, 1958, 72 Stat. 845.

of the Bureau of Prisons "shall cause a complete study to be made of the prisoner and shall furnish to the board of parole a summary report together with any recommendations which in his opinion would be helpful in determining the suitability of the prisoner for parole." Plainly, this provision is designed to facilitate evaluation of 4208(a) prisoners by the Parole Board.

The role of the judge in determining whether to sentence a defendant under Section 4208(a)(2) is a significant one. As Judge Moore pointed out in *United States* v. *Slutsky, supra,* 514 F.2d at 1229, the parole implications of such a sentence "are a necessary and important consideration for the sentencing judge."

The decision of the sentencing judge to impose an (a)(2) sentence, beside relieving a defendant from the restriction placed on eligibility for parole by Section 4202, is an expression of the court's expectations (1) that serious and meaningful parole consideration will be given to the prisoner by the Parole Board at an earlier date than the one-third point of his sentence permitted by 18 U.S.C. § 4202; and (2) that institutional performance and response to rehabilitative programs will be given due effect by the Parole Board in determining whether parole should be granted.

These expectations are in accord with the purposes of Section 4208(a)(2), as indicated by its legislative history and in the context of the statutory scheme of which it is a part. It is also in accord with the views expressed in texts and guides available to Federal Judges on the subject of sentencing, which are thoroughly discussed in *Garafola, supra,* 505 F.2d at 1218. *See* W. Hoffman,

"Purposes and Philosophy of Sentencing," Seminars for Newly Appointed United States District Judges, 286, 307 (West Pub. Co. 1971); Federal Judicial Center, Desk Book for Sentencing IV, 29–31 (1962); Institute on Sentencing for United States District Judges, 35 F.R.D. 381, 401 (1964); Seminar and Institute on Disparity of Sentences for 6th, 7th and 8th Judicial Circuits, 30 F.R.D. 401, 459 (1961). *See also United States* v. *Slutsky, supra,* 514 F.2d at 1227 n. 17, and 1228–29.

Judge Newman pointed out in *Grasso I* that "[s]entencing judges using the provisions of § 4208(a)(2) have done so in the expectation that the Board will consider prison performance in deciding whether to grant early parole." [8] 371 F.Supp. at 174.

As the Seventh Circuit said in *Garafola* v. *Benson, supra,* at 1218–1219:

> .  .  .  § 4208(a)(2) was enacted, and has been interpreted by sentencing judges since its enactment, to give the court sentencing an adult offender the authority to make him eligible for release at any time that in the Board's judgment is appropriate in light of factors that include his institutional performance and progress. Therefore, that provision, read in the context of the statutory scheme, imposes a duty on the Board to give *meaningful consideration* to parole prior to the time the Board would do so if the prisoner had been sentenced under § 4202." (emphasis supplied)

## II.

At the time of Grasso's initial parole hearing, in May, 1973, the Board of Parole had embarked on a pilot project, started in the Board's Northeast Region,[9]

---

**8.** *See also United States* v. *Zacharias,* 365 F.Supp. 256, 257 (S.D.N.Y.1973), where Judge Weinfeld stated that "[t]he Parole Board . . . determines . . . whether the defendant's response to the institutional program has been such that release on parole" is warranted. Chief Judge Foley's remarks at the sentencing in this very case, p. 28, *supra,* indicated his expectation that Grasso's release depended upon his "behavior" at Danbury.

**9.** The Board of Parole's Northeast Region includes the states of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia and the District of Columbia.

under which parole guidelines for adult offenders were used to aid the Board in determining the length of time to be served before a prisoner was granted parole. These guidelines were finally adopted in November, 1973 [10] and have been slightly revised from time to time since.

As Judge Moore described them in *United States* v. *Slutsky, supra,* 514 F.2d at 1227:

> . . . They [the guidelines] are in tabular form, indicating the customary range of time to be served before release for various combinations of offense and offender characteristics. Offenses are classified into one of six categories (ranging from "low" to "greatest") based on the severity of the offense, and the guidelines give examples of offenses which fall within each category. There are four classifications of offender characteristics (ranging from "poor" to "very good"), and a prisoner falls within one of them depending upon his parole prognosis (salient factor score).

The guidelines provide a mechanism for reducing disparity of sentences given by different judges, which was one of the purposes of the indeterminate sentencing procedure established under Section 4208(a).[11] They assume "good institutional adjustment and program progress" by the prisoner. Where circumstances warrant, decisions either above or below the guidelines may be rendered. Mitigating or aggravating circumstances in a particular case may justify a decision or severity rating different from that shown by a guideline table. Cases with "exceptionally good institutional progress achievement" may be considered for earlier release. The "salient factor score", used to determine poten-

tial risk of parole violation, is indicated by an evaluation sheet containing some nine items, eight relating to the prisoner's background and prior criminal record, and one relating to his plans after release. See 28 C.F.R. § 2.20 and *Battle* v.*Norton,* 365 F.Supp. 925 (D.Conn.1973).

The Board may also consider any other factors it may deem appropriate in reaching a parole decision, including those listed in 28 C.F.R. § 2.19. They include institutional experience and adjustment and comments by hearing examiners, including impressions gained at the hearing. The guidelines are heavily relied on by the Board. The court below found that the Board's decisions in 92 to 94 per cent of all cases fall within the guidelines. *Grasso II, supra,* 376 F.Supp. at 119. Neither the guidelines nor the listed factors for consideration of the Board make any distinction between (a)(2) prisoners and § 4202 prisoners.

At the time of the initial Grasso hearing there was an important difference between the Board's procedure with respect to 4202 prisoners and that with respect to (a)(2) prisoners.

In the case of 4202 prisoners, at the expiration of one-third of the sentence the Board held a full-scale institutional hearing conducted before two hearing examiners at which the prisoner was entitled to be present and could be questioned closely. Often his caseworker was also present. At that hearing the institutional progress and program achievement of the prisoner during the first one-third of his sentence was before the examiners and could be fully explored.

The (a)(2) prisoner was given an institutional hearing within three months of his commitment. The important differ-

---

**10.** The guidelines in effect at the time of Judge Newman's decisions below were contained in 28 C.F.R. § 2.52, 38 Fed.Reg. 31942 (Nov. 19, 1973). The announced purposes of the guidelines, as stated by Section 2.52(a) (now 28 C.F.R. § 2.20(a)) were "[to] establish a national paroling policy, promote a more consistent

exercise of discretion, and enable fairer and more equitable decision-making without removing individual case consideration."

**11.** See p. 32, *supra.*

ence between the two was that the (a)(2) prisoner had arrived at the institution so recently that no adequate information on institutional performance and program achievement was available and that important parole factor could not be considered by the examiners.

As a result of the application of the guidelines at initial (a)(2) hearings, between October 1973 and March 1974 51% of the (a)(2) prisoners in the Northeast Region had their sentences continued to a point beyond one-third of the maximum and 27% had their sentences "continued to expiration." [12] Thus, 78% were continued beyond the one-third point. Only 17 to 18% were released before the one-third point had been reached.[13] *Grasso II,* 376 F.Supp. at 118, 119.

Where an (a)(2) sentence was continued beyond the expiration of the one-third point, the prisoner was not given any further parole hearing until the date of such set-off. In the case of an (a)(2) prisoner continued to expiration, the prisoner received no further parole hearing at all, despite the fact that no opportunity to demonstrate institutional performance or program achievement had been afforded. This is the position in which Grasso found himself as an (a)(2) prisoner whose sentence had been continued to expiration at the initial hearing.

█ In our view, the practices and procedures of the Board which placed (a)(2) prisoners in this position do not conform with Section 4208(a)(2). The purpose and intent of that section when viewed in context requires, at the least, that (a)(2) prisoners be given no less effective and meaningful parole consideration than 4202 prisoners. This is what most sentencing judges expect in impos-

ing (a)(2) sentences. We agree with *Grasso I, supra; Diaz* v. *Norton,* 376 F.Supp. 112 (D.Conn.1974), and *Garafola* v. *Benson, supra,* that (a)(2) prisoners continued beyond the one-third point of their sentence are entitled to effective and meaningful parole consideration at or before the one-third point.[14]

### III.

Subsequent to the issuance of the conditional writ in *Grasso I* and the file review in Grasso's case which followed, the Chairman of the Parole Board issued a staff memorandum on March 4, 1974, stating:

> As a result of litigation in the "Grasso" case the following procedure was adopted by the Board and will be inserted in the Rules.
>
> "A prisoner with a maximum sentence of two years or more under Section 4208(a)(2) who is continued to a date past one-third of his maximum sentence at an initial hearing shall upon completion of one-third of his sentence receive a review on the record (including a current institutional progress report) by an examiner panel."

This change in procedure was embodied in revised rules of the Board applicable to the Northeast Region on June 5, 1974, 39 Fed.Reg. 20028. *See* 28 C.F.R. § 2.14(b).

*Grasso II* and *Garafola* v. *Benson* agree that the file review on the record for (a)(2) prisoners provided by the revised rule does not comply with the requirements of Section 4208(a)(2). Both cases take the position that Section 4208(a)(2) requires that an (a)(2) prisoner whose sentence has been continued be-

---

**12.** In *Garafola* v. *Benson, supra,* counsel for the Board conceded that these figures were substantially correct as to the Midwest Region also. 505 F.2d at 1215, n. 3.

**13.** Very few prisoners are granted parole at the initial hearing. See "You and The Parole Board", United States Board of Parole, p. 2 (1971): "If you received an [(a)(2)] sentence, you should not usually expect to be granted parole at the time of your initial hearing; ordi-

narily serious consideration is not given until your second personal appearance before the Board."

**14.** In exceptionally short Section 4208(a)(2) sentences, the initial hearing might be so close to the one-third point of the sentence as to obviate the need for later consideration. *See Grasso I,* at 175. Our conclusion here, therefore, applies to (a)(2) sentences that are substantially greater than one year.

yond the one-third point at an initial hearing, like non-(a)(2) prisoners, must be given a full-scale institutional hearing, at which he may appear in person, at or before the one-third point. Judge Newman, below, reasoned in *Grasso II,* at 118, that

[A]t the one-third point of his sentence, a non-(a)(2) prisoner has the opportunity to speak directly with the examiners and respond to their questions. Often his case worker is present to respond to the examiners' inquiry. The (a)(2) prisoner, remitted to a file review, loses this opportunity for direct personal contact. The fact that he had a hearing shortly after he arrived at the institution is no answer, because the very brevity of his time served before that first hearing precluded any realistic opportunity to persuade the examiners that his institutional progress merited parole.

██ On the other hand, *Stroud* v. *Weger, supra,* holds that the file review on the record (including a current institutional progress report) provided by the Board's revised Section 2.14(b) is sufficient to comply with the requirements of the statute. In *Stroud,* the Court stated

This court, which agrees that an (a)(2) prisoner cannot be given less effective parole consideration than a non-(a)(2) prisoner, nevertheless does not believe that at the one-third point the (a)(2) prisoner, who has already had an initial in-person parole hearing, is entitled to another in-person hearing. The new element absent from the (a)(2) prisoner's initial hearing that needs to be taken into account at the one-third point is his institutional performance and prison conduct, and this factor can be adequately reviewed by an examiner panel on the record by utilizing a current institutional progress report and by examining the inmate's prison file. An in-person hearing with respect to this factor would be of little benefit . . . .

380 F.Supp. at 901.

We agree with the view expressed in *Stroud* v. *Weger, supra.* The initial hearing given the (a)(2) prisoner is a full-scale institutional hearing at which the prisoner appears. At that hearing the panel of examiners can question the prisoner, listen to his statements and make an evaluation of his characteristics based on personal contact. The panel has before it information as to the prisoner's prior criminal experience, social background, capabilities, physical and mental health, and other pertinent factors. On the basis of this information, the panel determines what guidelines apply and what effect is to be given to them in the particular case.

What is lacking at that hearing is information as to the prisoner's institutional progress and program achievement which might indicate departure from the guidelines. Of course, such information does not exist at that point. But we see no reason why this factor cannot be adequately evaluated at the one-third point of the (a)(2) prisoner's sentence in the review on the record provided by 28 C.F.R. § 2.14(b).

At this point, the examiner panel conducting the file review will have before it the record of the initial hearing and the basis on which the initial decision was arrived at. It will also have before it a current institutional progress report which supplies the factor lacking in the initial hearing. Such a review should be adequate to determine whether the prisoner has had "exceptionally good institutional program achievement" or whether there are other circumstances which warrant a decision outside the guidelines for earlier release under 28 C.F.R. § 2.20(c). We fail to see how the appearance of the prisoner in person at that point would be of any material aid to the panel of examiners in reaching an informed decision.

As we view it, the combination of the initial institutional hearing and the file review on the record at the one-third point of the sentence provided by revised 28 C.F.R. § 2.14(b) gives the (a)(2) prisoner as effective and meaningful parole consideration as is afforded the non-(a)(2) prisoner by the institutional hear-

ing given when one-third of his sentence has expired.[15] This is all that 18 U.S.C. § 4208(a)(2) requires.

Congress has seen fit to give the Parole Board broad authority to determine in its discretion when and whether a prisoner should be released on parole, 18 U.S.C. § 4203(a).[16] Congress recognized that authority when it enacted Section 4208(a)(2) by providing that a prisoner sentenced under that provision "may become eligible for parole at such time as the Board of Parole may determine."

■ The Board plainly has the authority to make rules and regulations governing the practices and procedures under which its decisions may be arrived at, provided they are in accord with and within the limits of the authority granted to the Board by statute. In our view, the file review procedure now provided for (a)(2) prisoners is within the limits of the authority and discretion vested in the Board. We are not saying that the procedure now provided for (a)(2) prisoners is the best method for determining whether to grant them parole; we merely hold that such procedure is within the limits of the authority and discretion granted to the Board.

## IV.

■ It remains to be determined whether the court below committed reversible error in discharging Grasso from federal custody. We do not think it did.

The conditional writ in *Grasso I* provided that Grasso be discharged from

custody "unless within thirty days the Board rescinds its decision to continue petitioner to expiration and substitutes in lieu thereof a new order continuing petitioner to a date at or prior to the expiration of one-third of his sentence, at which time he will be entitled to parole consideration." It was apparently understood by all parties that the parole consideration referred to in the writ meant a full institutional hearing by an examiner panel. Indeed, the whole thrust of the memorandum decision in *Grasso I* was that (a)(2) prisoners like Grasso were entitled to the same institutional hearing at the one-third point of their sentences as non-(a)(2) prisoners. That this was the understanding of the Board is made clear by the application of its counsel to the district court for a limited stay "so that the Parole Board may have an opportunity to dispatch hearing examiners to the Federal Correctional Institution at Danbury." A further stay for the same purposes was granted by the court of appeals on application by counsel for the Board.

The Board informed Danbury that a panel of examiners would be arriving there to conduct an institutional hearing in Grasso's case. Then, after rather confusing maneuvers by the Board, detailed in *Grasso II, supra,* at 121, that hearing was cancelled at the last minute. The Board ended up with a file review in Washington at which Grasso was again denied parole. At no time did the Board apply to the court for modification or clarification of the conditional writ, as it should have done had it been in any

---

**15.** It has been argued that the parole consideration afforded the (a)(2) prisoner is less effective than that given to the non-(a)(2) prisoner because the non-(a)(2) prisoner is considered for parole at the one-third point on "a clean slate", while the (a)(2) prisoner at the one-third point faces the "stacked deck" of an initial decision against him. We do not find that argument persuasive. In each case the basic hurdle faced by the prisoner is whether the Board will depart from its guidelines. There is no reason why a departure from the guidelines is any less likely for (a)(2) prisoners than for non-(a)(2) prisoners under the Board's current procedures.

**16.** The relevant portion of Section 4203(a) provides:

> If it appears to the Board of Parole from a report by the proper institutional officers or upon application by a prisoner eligible for release on parole, that there is a reasonable probability that such prisoner will live and remain at liberty without violating the laws, and if in the opinion of the Board such release is not incompatible with the welfare of society, the Board may in its discretion authorize the release of such prisoner on parole.

doubt as to what the writ meant. *See Walker* v. *Birmingham,* 388 U.S. 307, 316–317, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). Cf. *Maness* v. *Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). The Board chose to ignore the direction of the court that an institutional hearing be held, and substituted a file review instead. Whether the conditional writ was later held to be erroneous in directing that an institutional hearing rather than a file review be held is beside the point. The conditional writ was a valid order of the court and remained in force and effect until set aside or reversed. *Walker* v. *Birmingham, supra.*

The conditional writ stated clearly what the consequences would be if the Board of Parole failed to comply with its directions, i. e., that Grasso would be discharged from custody. The Board chose to risk such consequences by its refusal to give Grasso the institutional hearing which the conditional writ required.

Under these circumstances it was within Judge Newman's sound discretion to issue the final writ discharging Grasso from custody.[17] The judgment discharging Grasso from custody is therefore affirmed.

FEINBERG, Circuit Judge (concurring and dissenting):

I concur in Parts I and II of the majority opinion. I dissent from Part III and concur in Part IV.

In Parts I and II, the majority opinion persuasively demonstrates that the Parole Board is supposed to give a prisoner sentenced under section 4208(a)(2) "serious and meaningful parole consideration . . . at an earlier date than the one-third point of his sentence" and that "institutional performance and response to rehabilitative programs will be given due effect by the Parole Board in determining whether parole should be granted." Ante, 33. In addition, (a)(2) prisoners at the very least should "be given no less effective and meaningful parole consideration" than prisoners sentenced under 18 U.S.C. § 4202. Ante, 35.

This case demonstrates that carrying out these worthwhile objectives can be difficult unless great care is taken to avoid conflict among them. Parole consideration after only a few months cannot possibly take into account individual response to a prison program. Not enough time has gone by to consider rehabilitation. Yet for the 17–18 per cent of (a)(2) prisoners who are released fairly quickly,[1] the first parole hearing after two or three months is a valuable procedure. But for those—like appellee Frank Grasso—who are not released prior to the one-third point in their sentences, the (a)(2) sentence may turn into a trap. Such a prisoner may never get an effective opportunity, by personally appearing before Parole Board hearing examiners, to persuade the Board that his performance in prison has been remarkable. When that happens, an (a)(2) prisoner is not treated for parole consideration at least as well as other prisoners. He is treated worse.

In sentencing appellee Frank Grasso, Chief Judge Foley told him that:

[T]he sentence in this type of case is in your favor. You are sentenced under Title 18, Section 4208(a)(2), which means that the Board of Parole may determine your eligibility for parole.

---

**17.** In view of our disposition of this issue, we do not reach the additional question of whether Grasso received an adequate and effective file review. Apparently, the Board shifted from an institutional hearing to a file review with such speed that neuropsychiatric and medical summaries, referred to in the progress report, were not attached to the report and were not considered by the panel conducting the file review. There is, therefore, at least a question as to the effectiveness of the file review and whether it complied with the Board's own regulations. The regulation then in ef-

fect, 28 C.F.R. § 2.14, provided in relevant part: "Before making a decision as to whether a parole should be granted or denied in any particular case, the Board will consider all available relevant and pertinent information concerning the case." This provision is now contained in 28 C.F.R. § 2.21 (39 Fed.Reg. 20028, June 5, 1974). *See Grasso II, supra,* at 122, n. 7.

**1.** *Grasso* v. *Norton (Grasso II),* 376 F.Supp. 116, 119 n. 2 (D.Conn.1974).

It depends upon your behavior at Danbury, . . . . The Board of Parole will determine when they think you are eligible to be released to the public.

As the majority opinion makes clear, both Congress and most sentencing judges agree with Judge Foley that rehabilitation is the most important criterion in determining whether an (a)(2) prisoner should be released. An empirical study by the Yale Law Journal of judges' attitudes confirms this impression. Parole Release Decisionmaking and the Sentencing Process, 84 Yale L.J. 810, 890 n. 388, 894 (1975).[2] On the other hand, only a few of the factors considered in the Board's new Guidelines are not available to, and presumably considered by, judges at the time of sentencing. Id. at 824. In fact, "in its choice of criteria" for the Guidelines the Board has "abandon[ed] any attempt to condition release upon rehabilitative factors." Id. at 826. The justification for the Board's position may be the inability of anyone by any method to predict which prisoners will successfully rejoin society upon their release. Id. at 826–28. But we need not decide whether the Board is correct because the issue is irrelevant. Congress has not removed rehabilitation as the most important standard governing release, at least under (a)(2). Therefore, both this court and the Board are bound to respect the intent of Congress expressed in section 4208(a)(2).

Given the overriding importance of rehabilitation in the statutory scheme, the Board is obliged to give an (a)(2) inmate full opportunity to present his case for release at a time when it can be made effectively. Part III of the majority opinion concludes that a file review at the one-third point can adequately assess the inmate's rehabilitation when coupled with the results of the full-scale hearing held at the beginning of the prison term. With all respect, I disagree. Compared to a personal hearing, a file review cannot explore as effectively the intangible personal factors which determine the inmate's progress to a productive role in society. If anything does lead hearing examiners to recommend to the Board decisions outside of the Guidelines, it is still an indication of rehabilitation. See 84 Yale L.J. at 829–30, 833–41.

Moreover, while perhaps the Board could, in its discretion, deny all inmates a chance to present in person their rehabilitative progress, it has commendably not chosen to do so. Since other adult prisoners are given this opportunity by the Board, to be consistent with the greater flexibility inherent in (a)(2), an inmate sentenced under the latter section must be treated at least as well. But an (a)(2) prisoner does not have as effective an opportunity as other prisoners to demonstrate exceptionally good institutional achievement. The (a)(2) prisoner's opportunity is inferior because (1) his personal hearing comes too early to show proven rehabilitative achievement and (2) when enough time has gone by to demonstrate such institutional rehabilitation, he cannot urge it in person accompanied by a representative, such as his case worker.[3] The key assumption of the majority on this issue is that "the appearance of the prisoner in person at that point would [not] be of any material aid to the panel of examiners in reaching an informed decision." At 36. The plain fact is that at that point, the (a)(2) prisoner's institutional adjustment was meant by Congress and the sentencing judge to be the most important consideration. If having a personal hearing has any value at all—and I believe that all of us on this panel agree that it does—then having a personal hearing at this time is crucial.[4]

The Yale article points out, 84 Yale L.J. at 891:

Although the Board's rationale is understandable—since the rehabilitation envisioned by the (a)(2) provision is no longer measured—its efforts to achieve equality here result in unequal

2. One of the student authors of this article was on the brief for appellee in this case.

3. 28 C.F.R. § 2.12(a) (1974); see 84 Yale L.J. at 840–41 & nn. 138, 141.

4. See *Grasso II, supra*, 376 F.Supp. at 118.

treatment for (a)(2) sentencees. Such treatment seems inconsistent with the clear congressional policy expressed in the (a)(2) statute, and the Board's failure to provide special consideration for these prisoners may therefore be unlawful. [Footnotes omitted.] [5]

Part II of the majority opinion does not go that far, holding merely that (a)(2) prisoners must at least "be given no less effective and meaningful parole consideration than 4202 prisoners." For the reasons discussed above, the Parole Board's practices do not meet even this less demanding standard.

Since the procedures used by the Parole Board give insufficient weight to the congressional emphasis on rehabilitation as a standard for release of (a)(2) prisoners and, in fact, treat them less favorably in this respect than other inmates, I dissent from Part III of the majority opinion. I concur in Part IV, which affirms Judge Newman's grant of the writ discharging Grasso from custody.

---

**5.** The authors go on to point out that

given the existence of the (a)(2) statutory provision the Board ought either to have sought congressional authorization for its action [abandoning assessment of rehabilita-tion in the Guidelines] or to have made special provision in its reforms to take account of the (a)(2) sentencing alternative.

84 Yale L.J. at 891 n. 393.