**Albert M. BILLITERI, Plaintiff,**

v.

**UNITED STATES BOARD OF PAROLE et al., Defendants.**

**Albert M. BILLITERI, Plaintiff,**

v.

**UNITED STATES BOARD OF PAROLE, Defendant.**

**Nos. Civ–74–355, Civ–74–580.**

United States District Court,
W. D. New York.

Sept. 17, 1975.

Philip B. Abramowitz, Buffalo, N. Y., for plaintiff.

Richard J. Arcara, U. S. Atty. (Dennis P. O'Keefe, Dept. of Justice Atty., Buffalo, N. Y., of counsel), for the Government.

CURTIN, Chief Judge.

These actions were consolidated. They concern the parole of Albert M. Billiteri, who was fined and sentenced to a term of five years in 1972 by the late Chief Judge John O. Henderson after entering a guilty plea to a violation of the general conspiracy statute, 18 U.S.C. § 371.

In March of 1974 the United States Board of Parole issued an order which denied parole and provided that Billiteri remain incarcerated until the expiration of his five-year term. The reason cited for the Board's decision was:

> Your release at this time would depreciate the seriousness of the offense committed and is thus incompatible with the welfare of society.

Following administrative appeals, Billiteri sought relief from this court. In *Billiteri v. United States Board of Parole*, 385 F.Supp. 1217 (W.D.N.Y.1974) [hereinafter "Billiteri I"], this court remanded the question of Billiteri's parole release to the Board for reconsideration. The record in Billiteri I revealed that the Board had proceeded on the assumption that Billiteri had been convicted of both conspiracy and extortion. Billiteri's conviction, in fact, was for conspiracy only. The placement of the wrong offense in the Board's parole guidelines, however, determined the outcome. Therefore, the Board's stated reason for denying parole, to wit, the seriousness of the offense *committed,* was deemed clearly erroneous. The court also criticized the boilerplate language the Board used to deny the plaintiff parole which failed to state the facts upon which the conclusion was based. In Billiteri I, the court acknowledged the commendable effort of the Board in establishing parole determination guidelines (28 C.F.R. § 2.-1 et seq.). Billiteri's offense severity was not specified, however, so the Board was directed to also reconsider the placement of Billiteri's "offense behavior" in the guidelines and was directed to complete the reconsideration within thirty days.

At the expiration of the thirty-day period, an order issued directing the Board to show cause why Billiteri should not be released because the Board failed to comply with the requirements of the order in Billiteri I. In addition, a new action was simultaneously commenced which alleged that Billiteri's organized crime connections had played a substantial part in denial of his parole.[1] The

---

1. Allegations regarding the denial of parole on the basis of Billiteri's organized crime ties were specifically denied by the government in Billiteri I.

two cases were considered together and an initial return date was scheduled. On the date of the return, the government submitted affidavits and other documents indicating that the Board was attempting to substantially comply with the court's order. The court thereafter directed that the government make a full and complete return within ten days, the additional period designed to permit the Board to complete its reconsideration. On January 16, 1975 the government submitted affidavits and records regarding the Board's January 13, 1975 determination to continue Billiteri to the expiration of his term, to wit, sustaining the prior determination.

From the government's return, it became apparent that the question of Billiteri's organized crime connections had in fact played a significant role in the procedures followed by the Board in conducting the redetermination.[2] Furthermore, the placement of Billiteri's offense behavior in the Parole Board's guidelines (28 C.F.R. § 2.20) had not received attention consistent with the remand decision in Billiteri I. [For a complete discussion of the reconsideration afforded Billiteri by the Board, see this court's decision in *Billiteri v. United States Board of Parole*, 391 F.Supp. 260 (W.D. N.Y.1975), hereinafter "Billiteri II".]

As a consequence, the court declined to remand Billiteri's parole problem to the Board for yet another reconsideration. Instead, a hearing was scheduled before the court for the specific purpose of taking testimony on the question of Billiteri's offense behavior, and on the question of Billiteri's organized crime connections. That hearing was held on April 30, 1975 and the parties have submitted numerous memoranda relative thereto.

Before discussing the hearing conducted before this court, it is necessary to discuss a question raised by the government for the first time in a supplemental post-hearing memorandum filed June 9, 1975. The government alleges that Billiteri. failed to exhaust the available administrative remedies following the Board's determination of January 13, 1975. This argument must be rejected.

The Board's decision of January 13, 1975 was occasioned by the order of this court in Billiteri I, after the government had asked for and received additional time to report to. this court on the reconsideration ordered in Billiteri I. On January 16, 1975, when the government first submitted the results of the reconsideration to the court, the issue of exhaustion of administrative remedies was neither argued nor raised. On April 4, 1975, when the decision in Billiteri II to hold a hearing in federal court was filed, the government did not appeal. The exhaustion of remedies question was not raised on April 28, 1975, in the government's pre-hearing memorandum, in the government's closing arguments

---

2. In a letter dated March 15, 1974 Henry E. Peterson, Assistant Attorney General for the Criminal Division, addressed a memorandum to the Chairman of the Board of Parole in response to a specific request dated March 8, 1974 for information pertaining to the organized crime connections of Albert M. Billiteri. Significantly, the request from the Board predates by three days the initial determination denying Billiteri parole. In the letter, Mr. Peterson cites links between Billiteri and other reputed organized crime figures in the Western New York area. Mr. Peterson closes his letter with a recommendation that Billiteri not be paroled.

From the record submitted by the Board of Parole, it is clear that the procedures followed in Mr. Billiteri's initial determination by the Board were affected by the organized crime designation. In fact, the reason for referring Billiteri's case upon reconsideration to the Regional Board of Directors was that the case had initially been designated one of "original jurisdiction" because of the organized crime label placed upon him. 28 C.F.R. § 2.17. From other documents submitted by the Board, it was determined in Billiteri II that the basis for referring Billiteri for original jurisdiction proceedings was the "mere allegation" of his ties to organized crime. This finding influenced significantly the court's decision to conduct a hearing on the propriety of the organized crime designation which Billiteri bore.

on the day of the hearing, or in the government's initial memorandum following the hearing submitted May 19, 1975.

■ It is clear that the decision in Billiteri II manifested a finding that further reference of Billiteri's case to the Board would be inequitable. Initially the Board had overstepped the time frame within which this court had ordered a reconsideration to take place. Secondly, the court specifically found that the question of the placement of Billiteri's offense behavior was not dealt with in a manner consistent with the court's direction. Thirdly, the element of the organized crime designation and the original jurisdiction treatment had been abruptly injected into the case, surprising the plaintiff. Furthermore, there is no procedure which an inmate can institute within the administrative process for review of an organized crime/original jurisdiction designation. This is particularly true for Billiteri because the Board persistently maintained that the organized crime/original jurisdiction designation played no part in the proceedings, although Billiteri II found to the contrary.

It is, therefore, apparent that Billiteri has exhausted the available administrative procedural processes at least once on the question of offense behavior. In addition, resort to administrative processes for the purposes of the organized crime designation appears to be futile.

■ A separate and distinct basis, however, for rejecting the government's argument lies in the inherent power of a federal court to see its orders enforced. Once having found in Billiteri II that the Board's reconsideration failed to comport with the directions contained in Billiteri I, this court could have directed the immediate parole of Billiteri. *Grasso v. Norton*, 520 F.2d 27 (2d Cir. 1975). It was the court's judgment, however, that a hearing in open court would further the interests of the plaintiff and the government in seeing these difficult questions resolved. Therefore, the hearing held on April 30, 1975 was scheduled.

## FINDINGS OF FACT

The testimony at the hearing immediately focused on the organized crime connections of the plaintiff Billiteri. The government produced three individuals who are currently participants in the government's witness protection program. All were convicted felons and admitted professional criminals. All had been acquainted with the plaintiff for several years preceding the plaintiff's conviction in this court.

Gregory Parness, who testified that he had performed several hundred burglaries in the late 60's in the Buffalo area, first became acquainted with Billiteri in 1967. According to his testimony, when he offered to sell Billiteri stolen property on various occasions, they were generally unable to agree on an acceptable price. On one occasion, however, when Parness agreed to sell Billiteri some stolen property for $1500, Billiteri paid him only $900 and reneged on the remaining sum agreed upon. On another occasion, he borrowed $200 from Billiteri, with the understanding that he would repay $240 within thirty days.

The most significant testimony that Parness offered related to a burglary of a Buffalo furrier. According to Parness, the stolen furs were sold to an individual in the New York City area. Subsequently, Billiteri and a Sam Lagatutta contacted Parness and his partners in crime and demanded $1,000 from each of the burglars for failing to offer the furs to Billiteri and Lagatutta before selling them out of town. When the three burglars refused to pay, they were beaten until they agreed.

Parness also testified in regard to an aborted burglary of a jewelry store. Billiteri had apparently furnished a tool critical to the success of the burglary in exchange for a percentage of the loot. Furthermore, Parness said he later had rings made for both Billiteri and Lagatutta with stones stolen in another bur-

glary. The gift of these rings was characterized as "tribute."

Joseph Zito, formerly of Batavia, New York, testified that he was a bookmaker and associated with a criminal syndicate operating in New York City. Zito's testimony focused on an incident in which he attempted to collect at least a partial payment on an unsecured loan made to a resident of Buffalo. When Zito returned for the payment, Billiteri, who was present, told Zito that he had no business being there and loaning money to Billiteri's clients. This "jurisdictional dispute" was resolved by having Billiteri eventually collect the loan. Zito also testified that Billiteri's reputation was as a bookmaker for the local criminal syndicate.

The government's final witness was Russell DeCicco, who testified that he was introduced into the Buffalo "family" by one Fred Randaccio in 1971. DeCicco and Randaccio became friends while both were inmates in Leavenworth. Upon arrival in Buffalo, DeCicco was assigned to work specifically with Billiteri. During this time, DeCicco was paid $100 a week, for which he performed no work. DeCicco testified that Billiteri claimed he ran a bookmaking and loan sharking operation which grossed $8,000 to $9,000 per week. DeCicco also said that he never saw Billiteri at the place where Billiteri's reputed bookmaking operation was being conducted. DeCicco related an incident when he accompanied Billiteri on a visit to a Buffalo businessman for the purpose of discussing an overdue loan. DeCicco testified, however, that no force or violence was either threatened or used.

DeCicco was apparently involved in the burglary of the Buffalo furrier which was prominent in Gregory Parness's earlier testimony. He said that he was the one who arranged for the furs to be sold in New York City. De-Cicco also made a deal with Billiteri in regard to the unsold furs, by furnishing Billiteri with a list of the size and the type of the remaining furs so that Billiteri could match them with customers. The alleged scheme was frustrated, however, when the furs were discovered by authorities and confiscated. DeCicco also corroborated some of Parness's testimony in regard to Billiteri's forcible exaction of $1,000 from each of the furrier burglars.

There were no other witnesses at the hearing. The government introduced grand jury and wiretap transcripts obtained during the investigation which led to Billiteri's indictment, plea, sentence and subsequent parole problems.[3]

Billiteri did not testify. The only proof his attorneys submitted consisted of materials brought to the attention of Judge Henderson at the time of sentence, including letters of reference regarding Billiteri's character and standing in the community.

## CONCLUSIONS OF LAW

The parties are agreed that the applicable standard for judging the organized crime designation should be that propounded by District Judge Zampano in *Masiello v. Norton*, 364 F.Supp. 1133 (D.Conn.1973), wherein the court said:

> . . . a prisoner may be classified as a member of organized crime if the officials of the Parole Board have a reasonable basis in fact to conclude that the inmate was a prominent figure in a structured criminal syndicate composed of professional criminals who primarily rely on unlawful activity as a way of life.

364 F.Supp. at 1135.

■ In my judgment, the Board has sustained its burden under this standard. The testimony regarding the "jurisdiction" which Billiteri had over loans and receipt of stolen property indicates that he held a position of some promi-

---

3. The government has voluntarily withdrawn the wiretap transcripts and they have not been considered by the court.

nence in the local criminal world.. This is further supported by the testimony regarding his bookmaking and loan sharking operation in which a number of other criminals were employed. Furthermore, all of the testimony in evidence indicates that Billiteri derived his livelihood from these various illegal activities.

The second question to be explored at the hearing, namely, how Billiteri's actual offense severity should be determined was not resolved. There was no testimony about this particular matter whatsoever. The government did submit the testimony of several witnesses in the grand jury proceedings which led to the indictment of Billiteri. However, these witnesses, although sworn, have never been cross-examined. Furthermore, the credibility of some of these witnesses is open to some question. Without doubt, this was a major factor in the government's offering Billiteri a plea to conspiracy rather than going to trial on the substantive extortion offense charged.

At the time of the plea, Billiteri had recently been exonerated in another felony criminal proceeding. Two other felony criminal cases were pending against him. As a result of lengthy negotiations, a package plea was endorsed by both parties and accepted by Judge Henderson.

In the actual plea proceedings dated May 24, 1972, Billiteri pled very circumspectly in an attempt to avoid pleading to an offense which would be construed as a felony under New York law. The plea proceedings are appended as a footnote.[4]

How this plea fits into the Parole Board's guidelines requires some explanation of the guidelines themselves. In a recent article, the federal parole release guideline procedures were thoroughly studied, explained and evaluated. *Parole Release Decision Making and the Sentencing Process*, 84 Yale L.J. 810. The Board uses a system in which its discretion in parole release determination has been structured. Two factors are considered, the salient factor score and the offense characteristics. The sa-

4. Plea proceedings:

THE COURT: Now, both of you lawyers are aware of my purpose here. I want to take a plea under Criminal Rule 11 of the Rules of Criminal Procedure which will be a solid plea in the judgment of this Court and the lawyers, both for the Government and the defendants, which cannot be disturbed by subsequent application to this Court or another court for lack of compliance with Rule 11. You understand that, each of you?

MR. BOREANAZ: Yes, your Honor.

MR. RODENBERG: Yes, your Honor.

THE COURT: What is your client willing to admit, by way of overt acts and the criminal conspiracy, wherein I would find support to accept a plea to Count I?

MR. BOREANAZ: Your Honor, for the sole purpose of complying with Rule 11, my client is prepared to admit—

THE COURT: Excuse me. I want you to listen carefully. I am going to ask you whether you listened carefully and whether you do admit these facts.

MR. BILLITERI: Yes.

MR. BOREANAZ: For the sole purpose of complying with Rule 11, my client is prepared to admit that within the time period set forth in the first count of the indictment that he and the codefendant, here now before your Honor, conspired and agreed to violate the substantive section set forth within that count, and that an overt act in furtherance of that criminal conspiracy was performed, to wit, Overt Act 3 of the indictment, that on or about June 23, 1969, my client made a phone call to Joseph LaPorta.

THE COURT: Now, I think I am going to have to have some further admission as to the nature and import of that call.

MR. BOREANAZ: That call was in furtherance of the criminal conspiracy, your Honor, he would admit.

THE COURT: In other words, in furtherance of the conspiracy to make these loans to one or more persons at exorbitant rates of interest, is that correct?

MR. BOREANAZ: That is correct, your Honor.

THE COURT: Mr. Billiteri, you have heard what your lawyer said. Did you make that call?

MR. BILLITERI: Yes, your Honor.

THE COURT: Was it for the purpose that Mr. Boreanaz just outlined?

MR. BILLITERI: Yes, your Honor.

lient factor is a parole prognosis score which evaluates the inmate's past personal history and release plans. The scores are grouped in four categories, from very good (a score of 9 to 11) to poor ( a score of 0 to 3). Offense characteristics are grouped in six categories, from low (minor theft) to greatest (espionage, hijacking and kidnapping).

The salient factors are grouped on the horizontal axis of a table. The offense characteristics form the vertical axis. The matrix which results has four points where each salient factor category intersects with each offense characteristic. At each point of intersection, a range of months has been set to represent the range of actual incarceration an inmate with that salient factor score and offense characteristic can expect to serve. The determination of Billiteri's salient factor score of 8, which is in the good category, is not in issue in this case. What is in issue is the assignment of Billiteri's offense to the very high severity category. On the table, Billiteri could expect to serve 36 to 45 months. If Billiteri's offense severity had been placed in one category below very high, he could expect to serve 20 to 26 months before obtaining his release. Therefore, the placement of the offense severity is of utmost importance in making the parole release determination. It is this determination which has been in question for some time in these proceedings.

The origin of the six offense severity categories is somewhat mysterious. The federal penal code provides for 18 different categories of offense severity if maximum sentence is the determining factor. 2 U.S. NAT'L. COMM'N. ON REFORM OF FEDERAL CRIM. LAWS, WORKING PAPERS 1250 (1970). The Board's categories, however, do not reflect the Congressional finding of offense severity. *Parole Release Decision Making and the Sentencing Process, supra* at 887. Furthermore, offenses not specifically categorized are placed into categories by comparing their severity with those of similar offenses, with the qualification that

if an offense can be listed in more than one category, the most serious category is the one that is to be used. 28 C.F.R. § 2.20, Notes to Adult Guidelines for Decision Making.

Billiteri's offense was conspiracy, 18 U.S.C. § 371, but conspiracy is not listed among the Board's guidelines. According to the affidavit submitted by the Board prior to the decision in Billiteri II, the determination was made from reviewing the presentence report that Billiteri's offense most closely resembled extortion, and was appropriately assigned to the very high category. The Board failed to set forth any precise factual basis for reaching this particular determination. The result, however, is to place an offense carrying a maximum sentence of five years in a category with an offense carrying a maximum sentence of twenty years.

Billiteri possessed a salient factor score of 8, which qualified him for release in a range of 36 to 45 months. An inmate with a poor salient factor score would be required to serve a range of 55 to 65 months under a similar offense severity finding. For that inmate, the range would extend beyond the statutory maximum which Congress has set for the actual offense committed. Certainly a sentencing court could not consider a punishment outside the statutory maximum. *United States v. Doyle*, 348 F.2d 715, 721 (2d Cir.), *cert. denied,* 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965); *United States v. Hendrix*, 505 F.2d 1233 (2d Cir. 1974). Yet, in the Board's view, it is within its discretion to virtually do so.

A further, and more important, consideration is the government's negotiation for and acceptance of a plea to conspiracy. That agreement binds the government. *Santobello v. New York*, 404 U.S. 257, 262–63, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *S & E Contractors, Inc. v. United States*, 406 U.S. 1, 10, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972). Now the government, having successfully bargained away the obligation to prove extortion against Billiteri, seeks to estab-

lish Billiteri's guilt of the underlying substantive offense by the bald assertion that conspiracy cannot occur in a void. Examination of the plea, set forth above, however evidences Billiteri's minimum involvement. If there was to be any discussion of Billiteri's commission of the substantive offense, that was the time.

An additional consideration is the effect of the use of the substantive offense in determining parole eligibility upon a defendant's knowing waiver of rights at the time of plea. *Bye v. United States*, 435 F.2d 177 (2d Cir. 1970); *Michel v. United States*, 507 F.2d 461 (2d Cir. 1974). *See also* YALE L.J., *supra* at 880–82.

Unfortunately, the Board did not set forth where, if anywhere, in the guidelines Billiteri's offense behavior was determined *not* to lie. For instance, under the moderate category, the offense of mailing threatening communications is found (18 U.S.C. § 876). Examination of the minutes of the guilty plea proceeding indicates an offense behavior more closely approximating the sending of threatening communications than behavior approximating extortion. In fact, the sending of extortionate threats by mail appears to lie in the moderate category while a similar communication Billiteri transmitted by telephone would, in the Board's view, lie in the very high severity category.

 In the final analysis, this court is in a somewhat incongruous position. There is ample support for the proposition that Billiteri was an organized crime figure. The Board, however, did not rely on this fact in reaching its ultimate determination because there was allegedly a sufficient underlying basis for denying parole, to wit, the offense severity. This court finds, however, that the submitted underlying basis is without rational foundation and cannot support the determination made. Furthermore, another remand to the Board, in light of its past performance, is undeserved, as well as unfair to the plaintiff. Therefore, this court must fashion an appropriate remedy now.

Plaintiff Billiteri's history of organized crime ties indicates that his parole prognosis is at best uncertain. Under the circumstances, I find that his salient factor score of "8" does not accurately reflect his criminal tendencies as demonstrated by the testimony in this court. Therefore, I assign him a salient factor score of "0", the lowest possible.

In regard to his offense behavior, this court has twice rejected the Board's determination that the offense be placed in the "high severity" category. Assignment to any specific category below that of "high severity," however, reveals that Billiteri, even with a salient factor score of "0", has served the maximum period of incarceration applicable under the guidelines.

Therefore, the defendant, United States Board of Parole, is hereby directed to forthwith release the plaintiff, Albert M. Billiteri, on parole, attended by such conditions and privileges deemed appropriate by the Board in its discretion.

So ordered.